[644 NYS2d 43]

Stanley R. Jaffe, Appellant, v Paramount Communications, Inc., et al., Respondents.

First Department, June 18, 1996

---

### APPEARANCES OF COUNSEL

*Louis A. Craco* of counsel *(Joseph T. Baio, Martin Klotz* and *Colin F. Bell* on the brief; *Willkie Farr & Gallagher,* attorneys), for appellant.

*Stuart J. Baskin* of counsel *(Jerome S. Fortinsky* and *Edwina F. Martin* on the brief; *Shearman & Sterling,* attorneys), for respondents.

### OPINION OF THE COURT

NARDELLI, J.

The plaintiff was an executive who received a large salary, bonuses and stock options as part of his employment contract with defendant Paramount. Unlike many of his contemporaries, when he and the corporation finally parted ways, he did not receive a "golden parachute." However, he did receive exactly what he had bargained for. If he had tendered his 30-day notice of termination, he would have been entitled to exercise his remaining options as of the date of the notice.

Plaintiff Jaffe was the President and Chief Operating Officer of defendant Paramount Communications, Inc. (Paramount) under an employment agreement dated March 18, 1991 (the Agreement). Pursuant to the Agreement, besides his salary and bonuses, plaintiff received 100,000 shares of Paramount common stock outright. He also was given 700,000 options for Paramount common stock which were exercisable at a rate of 116,666 shares per year through February 22, 1997, the term of the Agreement. Plaintiff's right to exercise the options could also be accelerated upon the occurrence of certain events. Thus, his right to accelerate his unexercised options was defined under section 9.2 of the Agreement as follows:

"9.2 Accelerated Exercisability of Options.

"If, at any time during the Employment Term, the Company notifies the Executive of termination of employment for any reason other than Cause or Permanent Disability, or if, after a Change in Control, the Executive notifies the Company of

termination of his employment for Good Reason as provided in Section 14, then all Stock Options which have not previously become exercisable shall immediately vest and become exercisable in accordance with the 1989 Stock Option Plan upon the giving of such notice by the Company or the Executive, as applicable."

Accordingly, Jaffe's right to accelerate the options would vest under two circumstances: (1) a termination without cause initiated by Paramount, or (2) a termination of the Agreement "for Good Reason" initiated by Jaffe himself in the event of a "Change in Control".

A termination "without cause" could be effected by Paramount pursuant to section 4 of the Agreement which, pursuant to section 13, was amended in the event of a "Change in Control of the Company" to provide, in relevant part: "Notwithstanding any other provisions of this Agreement, prior to the end of the Employment Term the Company may terminate the Executive's employment *only by giving not less than 5 days advance written notice to the Executive"* (emphasis added).

Jaffe's right to terminate the Agreement "for Good Reason" was set forth pursuant to section 14 of the Agreement which became effective "only after a Change in Control of the Company". Section 14 provided that Jaffe himself could terminate his employment upon 30 days' written notice for "Good Reason" which was defined to include, *inter alia*: "(i) The assignment to the Executive by the Company of duties inconsistent with the Executive's then position, duties, responsibilities, titles or offices or any reduction in his duties or responsibilities".

Section 14 of the Agreement additionally stated: "(vii) Any purported termination of the Executive's employment which is not effected pursuant to a notice of termination satisfying the requirements of Sections 5 *[sic]* or 6 of this Agreement, and, for purposes of this Agreement, *no such purported termination shall be effective."* (Emphasis added.)

There were also several other situations which were deemed under the Agreement to be terminations "without cause" by Paramount under article 1 of the Agreement which were not self-executing in relation to Jaffe's right to accelerate the options, but required Jaffe to give written 30-day notice of termination in order to accelerate his right and acquire a vested interest in the options. These provisions, which appeared at sections 1.4, 1.5, 1.6, and 1.7 of the Agreement, dovetailed with the provisions of section 14, and included: a

transfer of the executive outside of the New York City metropolitan area (section 1.4); the assignment of duties other than those of President and Chief Operating Officer (section 1.5); the company's failure to obtain a specific assumption of the Agreement by any successor or assign or any person acquiring substantially all of the company's assets (section 1.6); and a material breach of contract by the company (section 1.7). Each of these provisions stated that the triggering event entitled Jaffe to: "terminate his employment hereunder upon 30 days advance written notice to the Company, which termination shall be deemed for all purposes under this Agreement to be a dismissal of the Executive by the Company without Cause and Executive shall be entitled to receive the payments provided for in Section 4; the Stock Options shall immediately vest and become exercisable upon the giving of such notice".

Accordingly, Jaffe's right to accelerate his options under these provisions would vest upon the *giving* of the notice, and not at the end of the 30-day notice period.

In or around September 1993, Viacom and QVC Network, Inc. (QVC) started a bidding war for Paramount. Viacom won in a two-step bid, consisting of an offer to acquire 50.1% of Paramount's common stock for a cash price of $107 per share, to be followed by a merger in which the remaining shares of Paramount's common stock would be exchanged for a package of Viacom securities with an estimated value of less than $50 per share. On or about February 14, 1994, Viacom acquired 50% of Paramount, sealing its victory over QVC. However under the terms of the "auction", Paramount shareholders, including Paramount employee shareholders, were permitted to tender their Paramount shares until midnight of March 1, 1994 to participate on a pro rata basis in the $107 per share "first step" or "frontload" of Viacom's two-step bid. After that date, shareholders who tendered shares would receive only the lesser-valued package of Viacom securities.

Jaffe's complaint alleged, *inter alia*, that prior to February 1994, Paramount had announced to the media that Jaffe would be replaced as Chief Operating Officer of Paramount, and that Paramount misled him by informing him that no such decision had yet been made. The complaint asserted that commencing in or around mid-February 1994, Jaffe's duties were materially reduced in that, among other things, he was excluded from meetings that would normally be attended by Paramount's President and Chief Operating Officer, and was not advised of when these meetings were scheduled. The complaint goes on to

state that on or about February 20, 1994, Marvin Davis, Paramount's Chairman and Chief Executive Officer, met with Viacom executives, including defendant Redstone, and that during this meeting it was decided that Davis should inform Jaffe of the Board's decision to terminate his employment. According to the complaint, Davis orally notified Jaffe on February 28, 1994 that his employment would be terminated, and that effective immediately, he would have no role in Paramount's ongoing business or operations.

Plaintiff took the position that his right to accelerate his remaining stock options vested as of that date, and that he should, therefore, have been entitled to tender his shares for the front-end buy-out price of $107 per share. In fact, Jaffe's attorney did attempt to exercise the remaining stock options on February 28, 1994 but his tender was refused by Paramount. Jaffe's complaint alleged that Paramount's refusal to honor the options constituted a breach of the Agreement, and of Paramount's 1989 Employee Stock Option Plan, and that Viacom and Redstone tortiously interfered with Paramount's contractual obligation to honor the exercise of his stock options.

The IAS Court granted defendants' motion pursuant to CPLR 3211 (a) (1) and (7) and dismissed the complaint.

Section 4 of the Agreement provided that termination of the executive could be effected *only* by giving five days' written notice. Pursuant to section 16, all notices or communications had to be in writing, sent certified or registered mail, return receipt requested, etc. Thus, written notice was clearly required and therefore, no matter what Marvin Davis said or how unequivocally he purported to "fire" plaintiff, Mr. Jaffe could not be, and was not terminated by the company prior to five days after his receipt of a letter from Paramount dated April 6, 1994, which terminated Jaffe five days after receipt of the letter. Inasmuch as Jaffe's employment did not terminate until five days after his receipt of Paramount's April 6, 1994 letter, only then did his unexercised stock options vest and become exercisable pursuant to section 9.2 of the Agreement.

Plaintiff's contention that he could waive the requirement that notice of his termination be in writing because such provision was for *his* sole benefit, is without merit. Plaintiff set forth no legal basis whatsoever for such an assumption.

Section 4 of the Agreement stated: "the Company may terminate the Executive's employment *only* by giving not less than 5 days advance written notice to the Executive" (emphasis added).

Plaintiff has advanced no New York authority to support his argument that he could waive the written notice of termination provisions of the Agreement. This is not surprising in light of General Obligations Law § 15-301 (4) which states: "4. If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, *the requirement that such notice be in writing cannot be waived* except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent." (Emphasis added.)

In any event, the requirement that notice be in writing was also in Paramount's interest as it promoted clarity of rights and avoided litigation by limiting occasions for disputes based upon misunderstandings or undocumented claims.

Plaintiff's claim that he did not tender notice in reliance upon Davis' statement that he was fired, was also without merit.

Plaintiff's estoppel argument is also without merit. Section 14 of the Agreement, which took effect only in the event of a change in control, which plaintiff claims took place as of February 14, 1994, in defining "Termination for Good Reason," states: "(vii) Any purported termination of the Executive's employment which is not effected pursuant to a notice of termination satisfying the requirements of Sections 5 *[sic]* or 6 of this Agreement, and, for purposes of this Agreement, no such purported termination shall be effective."

Any conversation Davis had with the plaintiff, therefore, could not have effected a termination of the contract without the requisite written notice, and in view of the express requirements of the contract, no factual issue is raised because of plaintiff's purported reliance upon the February 28, 1994 oral termination. This is especially true in light of plaintiff's status as a sophisticated business executive.

In addition, as found by the IAS Court, plaintiff's contention that Paramount breached its obligations of good faith and fair dealing by failing to promptly notify him that his duties were being reduced and that he would be fired, was also without merit.

Implied in every contract is a covenant of good faith and fair dealing (*Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62), which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the

benefits under their agreement. In this case, as part of his breach of contract claim, Jaffe has alleged that Paramount breached the implied duty of good faith and fair dealing for failing to inform him sooner that his duties would be reduced, or that he would be dismissed. However, plaintiff failed to allege any facts to demonstrate that Paramount deprived him of any rights he had under the Agreement, and the IAS Court properly dismissed this claim.

Accordingly, when Davis told Jaffe on February 28, 1994 that his duties were being reduced or eliminated, plaintiff had the right, under section 1.5 of the Agreement, to serve a 30-day notice of termination upon Paramount. Section 1.5 provided: "the Stock Options shall *immediately* vest and become exercisable upon the giving of such notice" (emphasis added).

Had plaintiff given such written notice of termination to Paramount, his right to accelerate the options would immediately have vested, and he would have been able to exercise his options at the tender price. Paramount's purported delay in informing Jaffe that he would be fired, or that his duties would be reduced, did not deprive plaintiff of any rights under the Agreement. Plaintiff simply failed to exercise the rights he possessed, and the allegations in the complaint, that defendants knew that they would terminate Jaffe or reduce his duties months before they actually told him so, are simply irrelevant, since, even if true, such actions did not deprive plaintiff of his opportunity to exercise the options at the Viacom buy-out price.

Plaintiff also claims that the Viacom buyout constituted an event for which he was entitled to an adjustment of the stock option price. The provision of the 1989 Stock Option Plan that plaintiff claims was breached stated: "9.1 If * * * (b) the Company shall declare a dividend payable to or shall subdivide or combine its Common Stock; *or (c) any other event shall occur which in the judgment of the Committee necessitates action by way of adjusting the terms of the outstanding Options*, the Committee shall forthwith take any such action as in its judgment shall be necessary *to preserve the Optionee's rights substantially proportionate to the rights existing prior to such event* and to the extent that such action shall include an increase or decrease in the number of shares of Common Stock subject to outstanding Options, the number of shares available under Article IV above shall be increased or decreased as the case may be, proportionately. *The Judgment of the Committee with respect to any matter referred to in this Article shall be conclusive and binding upon each Optionee.*" (Emphasis added.)

While defendants rely primarily upon that portion of the above-quoted language stating that the Committee's judgment "shall be conclusive and binding", the language used suggests that this provision was simply inapplicable to the events that occurred herein. Thus, the paragraph emphasizes adjustments for events such as stock splits, stock dividends and the like, which would increase or decrease the total number of shares outstanding. Moreover, if, as plaintiff contends, the triggering "event" was the Viacom tender offer, then the Committee would only have been obligated to preserve the rights plaintiff had "prior to" that event, and he would not have been entitled to any adjustment at the buy-out price. In addition, as discussed *supra*, plaintiff could have accelerated the vesting of his options in time to receive the buy-out price by submitting notice of termination of the Agreement. His request for an adjustment did not occur until after he commenced this litigation, in the form of a threat or offer of settlement, and the Committee had no legal obligation to adjust the value of his options to the tender price. In fact, it was not in the company's best interest to pay $107 per share for Jaffe's 466,668 unexercised options. Thus, the complaint fails to state a cause of action for breach of contract under the 1989 Stock Option Plan.

"In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of the contract by the other party." (*Inselman & Co. v FNB Fin. Co.*, 41 NY2d 1078, 1080.) Since plaintiff failed to state a cause of action for breach of contract against Paramount, the tortious interference claims against defendants Viacom and Redstone were also properly dismissed.

Accordingly, the judgment of the Supreme Court, New York County (Walter M. Schackman, J.), entered February 6, 1995, dismissing the complaint, should be unanimously affirmed, without costs or disbursements. The appeal from the order of the same court and Justice, entered January 26, 1995, which granted defendants' motion to dismiss the complaint, is dismissed as subsumed within the appeal from the judgment, without costs or disbursements.

SULLIVAN, J. P., KUPFERMAN and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, entered February 6, 1995, affirmed; appeal from order, same court and Justice, entered January 26, 1995, dismissed, as subsumed within the appeal from the judgment, without costs and without disbursements.