CANPARTNERS INVESTMENTS IV, LLC, and Cerberus Partners, L.P., Plaintiffs,

v.

ALLIANCE GAMING CORP., Defendant.

No. 96 CIV. 9788(HB).

United States District Court, S.D. New York.

Oct. 27, 1997.

Order Granting Reconsideration Dec. 18, 1997.

Robert Abrahams, Schulte Roth & Zabel, LLP, New York, NY, for Plaintiffs.

Michael L Hirschfeld, Millbank, Tweed, Hadley & McCloy, New York, NY, for Defendant.

## OPINION AND ORDER

BAER, District Judge:

Defendant removed this breach of contract action from state court and now moves to dismiss the complaint. For the reasons discussed below, the motion is GRANTED in part and DENIED in part.

### BACKGROUND

Plaintiffs Canpartners and Cerberus entered into a Commitment Letter dated August 30, 1995 ("Letter") with defendant Alliance Gaming, pursuant to which plaintiffs agreed to fund Alliance's subsidiary, BGII, in its tender offer, which sought to take over Bally Gaming. The Letter promised $30 million for the takeover. The letter also provided for the payment of "Commitment Fees" to plaintiff in the amount of $750,000 upon acceptance by defendant. Letter at 3, ¶ 8. Two side agreements of the same date provided for an additional $300,000 in Commitment Fees, for a total of over $1 million. There was acceptance by the defendant and the commitment fees for making the money available have been paid. Plaintiffs also received warrants for 250,000 shares of Alliance stock.

The Letter is *not* a loan agreement. Rather, it commits the plaintiffs to make the $30 million available upon the occurrence of certain conditions precedent spelled out in Schedule I. These conditions precedent include the execution of actual loan documents and a successful effort by Alliance to borrow $35 million from a senior lender. The Commitments expired after six months (i.e., on February 28, 1996) unless the loans were funded or the terms of the letter extended.

The Letter also provides that Alliance shall pay the respective plaintiffs "break-up" fees of $1.17 million and $780,000,

> in the event that the Borrower [Alliance] ... enters into any written agreement, commitment letter or other written understanding with respect to providing, directly or indirectly, financing for the consummation of the Tender Offer or any other acquisition by the Borrower ... either directly or indirectly, of more than 50% of the stock of Bally or involving a merger or consolidation with Bally.

Letter at 5. This provision is central to the dispute. On October 18, 1995, Alliance signed a friendly Merger Agreement with Bally Gaming, under which Alliance acquired Bally Gaming's stock for cash and shares of Alliance stock. The Merger Agreement did not itself provide any financing for Alliance. It did require, however, as a "closing Condition," that "Alliance shall have obtained $150,000,000 of financing having terms that

are commercially reasonable.... The financing shall include a sale for cash ... of Series B Special Stock ... and at least two-thirds of the financing shall be in the form of bank debt." Merger Agreement ¶ 7.1.6. Subsequently, in June 1996, after the Letter agreement with plaintiffs expired, Alliance obtained the funding.

## DISCUSSION

### I. The First Cause of Action: Breach of Contract

■ Plaintiffs allege in Count I of the complaint that Alliance breached the Letter by failing to pay the $1.95 million in break-up fees. Defendants move to dismiss on the ground that the Letter unambiguously does not require the payment of break-up fees. Defendants argue that the Merger Agreement with Bally does not *provide* direct financing for the defendants in order to trigger payment under the break-up provision, but rather contemplates Alliance getting financing elsewhere. "Under New York law ... whether a contract is ambiguous is a matter of law for the court to decide.... " *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996).

Plaintiffs contend in their papers that Alliance's Merger Agreement with Bally is a "written agreement ... *with respect to* providing, directly or indirectly, financing ... involving a merger or consolidation with Bally", Letter at 5, and that the break-up fees are therefore due and owing. Read in this fashion the argument fails since the Merger Agreement does not "provide financing," but rather contemplated that the defendant would obtain financing elsewhere.

At oral argument, plaintiffs presented a more compelling argument, noting that the break-up provision should be read as follows:

in the event that the Borrower [Alliance] ... enters into any written agreement, commitment letter or other written understanding [i] with respect to providing, directly or indirectly, financing for the consummation of the Tender Offer or any other acquisition by the Borrower ... either directly or indirectly, of more than 50% of the stock of Bally or [ii] involving a merger or consolidation with Bally.

Read this way, the provision does not require that a merger agreement relate to financing in order to trigger the provision. As there are two reasonable interpretations of the break-up provision, the Court finds that the Letter is ambiguous and its interpretation is a question of fact for the jury. Plaintiffs have stated a claim for breach of contract, and the motion to dismiss is denied with respect to the first cause of action.[1] One lesson to be learned from this conclusion is how more time spent drafting can save time in Court.

### II. The Second Cause of Action: Breach of Duty of Good Faith and Fair Dealing

■ Plaintiffs allege that defendant breached its duty of good faith and fair dealing by negotiating the Merger Agreement with Bally (which negated the need for any loans from plaintiff) while simultaneously negotiating the terms of the loans with plaintiffs pursuant to the Letter. Plaintiffs allege that defendant thereby obviated the funding of the loans and seek damages in excess of $12 million (apparently the 20% interest they would have earned had the loans been made).

---

1. Though not addressed in the parties' motion papers, the Complaint also states that "Defendant has refused to pay any of Cerberus' and [Canpartners'] out-of-pocket expenses incurred in connection with this transaction." Compl. ¶ 35. The Letter specifically states that "The Borrower [Alliance] shall pay all of the reasonable out-of-pocket expenses incurred by each Lender [Plaintiffs] ... in connection with the Acquisition ... and the other transactions contemplated hereby, whether or not ... the Loans are made or the Acquisition is consummated." Letter at 3, ¶ 8; *see also id.* at 5 (same). Accordingly, plaintiffs have also stated a cause of action

for breach of contract based on defendant's refusal to reimburse the out-of-pocket expenses incurred in connection with plaintiffs' obligations under the Letter. Defendant conceded at oral argument that plaintiffs have a valid claim for breach of contract in this regard, but argued that the complaint must be amended because out-of-pocket expenses are not requested in the *ad damnum* clause. Because the complaint states that defendant failed to pay such expenses and seeks "such other and further relief as the Court may deem just and proper" the unamended Complaint is sufficient to state a claim for such expenses.

■ "Under New York law, every contract contains an implied covenant of good faith and fair dealing. This covenant includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991) (citations and internal quotations omitted). That is, a party to a contract cannot act so as to "deprive the other party of the right to receive the benefits under their agreement." *Jaffe v. Paramount Communications, Inc.*, 222 A.D.2d 17, 644 N.Y.S.2d 43, 47 (1996). While a party can breach the covenant of good faith and fair dealing without breaching any terms of the contract itself, *Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818(RWS), 1996 WL 457320 (S.D.N.Y. Aug. 14, 1996) at *6, it is axiomatic that an implied covenant must comport with the parties' intent and be consistent with the written provisions of the contract. *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1517 (S.D.N.Y.1989); *Interallianz Bank AG v. Nycal Corp.*, No. 93 Civ. 5024(RPP), 1994 WI, 177745 (S.D.N.Y. May 6, 1994) at *8. Furthermore, "[t]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Macfarlane & Assocs., Inc. v. Noxell Corp.*, No. 93 Civ. 5192(PKL), 1994 WL 369324 (S.D.N.Y. July 13, 1994) at *3.

An examination of the Letter indicates two "benefits" bargained for by plaintiffs. The first is the over $1 million in Commitment Fees which they received from defendant. The second is the interest on the loan dollars, explicitly conditioned upon the loans closing. While defendant's agreement with Bally precluded the loans closing, that possibility was clearly contemplated by the parties. The nature of the agreement was a "commitment," not a loan agreement. Plaintiffs agreed to make $30 million available and receive over a million dollars in consideration therefore.

This case is similar to *Macfarlane, supra.* The parties in *Macfarlane* entered into an agreement whereby plaintiff marketed defendant's goods in exchange for a commission based on a percentage of defendant's sales. The agreement also contained an explicit termination provision. When defendant invoked the termination provision and terminated the contract, plaintiff sued, alleging, *inter alia*, that defendant's negotiations with another marketer during the pendency of the agreement was a breach of the duty of good faith and fair dealing. The *Macfarlane* court dismissed this claim, noting:

> Allowing plaintiff[s] to pursue a cause of action based ... on defendant's discussions with other firms would be in essence adding a new provision to the Agreement, namely, that defendant could not negotiate with any other potential sellers so long as the contract with plaintiff remained in force.... Additionally, construing the implied covenant as plaintiff suggests would make the Agreement inconsistent in light of the flexibility provided through the termination provision.

*Macfarlane*, 1994 WL 369324 at *3.

If one were to accept plaintiffs' allegations. the absurd result would be to make defendant liable for the $12 million in interest on the loans that were never made, for breach of this *implied* term, while the explicit breakup provision provided for only $1.95 million in damages. The break-up provision indicates that the parties clearly contemplated the possibility that the loans would not close. Indeed, the break-up provision contemplates that defendant might enter into written agreements with other lenders, in which case it would be liable for additional specified damages. To hold defendant separately liable for negotiating such agreements without plaintiffs' knowledge is plainly inconsistent with the specific terms of the break-up provision, which holds defendant liable in certain enumerated circumstances.

Indeed, plaintiffs concede that defendant had the right to negotiate the merger agreement with Bally. Pl. Mem. at 14. They contend only that "Alliance had a duty to act in good faith and deal fairly with them in negotiating for the funding of the loans,

which would require Alliance to be candid and honest about its negotiations with third parties and not encourage Plaintiffs to make the $30 million financing available if it lacked any intention of obtaining financing from them." *Id.* Plaintiffs' complaint about defendant having "encouraged [them] to make the $30 million financing available" is misplaced. Plaintiffs received over $1 million in consideration for making the $30 million available and had an obligation to do so pursuant to the Letter agreement, regardless of whether defendant was negotiating with Bally.

Finally, the precise language of the termination provision and the addendums to the Letter further supports the view that defendant had no duty to abstain from, or disclose, its negotiations with Bally. The termination provision provides that the break-up fees be paid "immediately" upon the occurrence of the triggering event, *unless* there was a good faith disagreement among the parties in negotiating the terms of the loan, in which case the break-up fees were to be paid at a later date. Such a provision necessarily contemplates circumstances in which the break-up fees would be due, other than "good faith" disagreements arising during the loan negotiations.[2] To impose a good faith obligation would thus frustrate the rather precise termination mechanism for which the parties themselves bargained.

Similarly, Schedule I to the Letter, setting forth the conditions precedent to funding the loans, twice refers to the Lenders' (i.e., plaintiffs') obligation to negotiate the loan terms in good faith, but nowhere refers to an equivalent obligation by defendant. *See* Letter at 1–2, ¶¶ 6,7. Such a construction is completely consistent with the nature of the agreement between the parties. Plaintiffs committed to making $30 million available to defendant, and thus had a duty to negotiate the loan terms in good faith so as to not render this commitment nugatory. Defendant, by contrast, did *not* commit to actually borrowing the $30 million and therefore has no concomitant duty to negotiate the terms of the loan with plaintiffs.

An implied covenant by defendant not to negotiate a merger is therefore inconsistent with both the terms of the Letter and the intent of the parties evidenced therein. Defendant's motion to dismiss plaintiffs' claim for breach of the duty of good faith and fair dealing is granted.

### III. The Third Cause of Action: Fraudulent Concealment

■ Plaintiffs allege that defendant fraudulently concealed its negotiations with Bally Gaining and that plaintiffs relied on such concealment to their detriment by continuing to negotiate the terms and details of the loans with defendant between August 30 and October 18. Plaintiffs do not assert a cause of action for fraud in the inducement because they do not know when defendant began the Bally negotiations.

■ To state a cause of action for fraud, plaintiffs must allege (1) a material misrepresentation, (2) scienter, (3) reasonable reliance and (4) damages. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995). When a claim is based on alleged nondisclosure of a material fact the plaintiff must also allege facts giving rise to a duty to disclose. *Success Universal Ltd. v. CWJ Int'l Trading, Inc.*, No. 95 Civ. 10210(DLC), 1996 WL 535541 (S.D.N.Y. Sept. 20, 1996) at *6. Plaintiffs' claim fails because they have failed to allege damages or a duty to disclose.

As to damages, plaintiffs have failed to articulate how they were harmed by the nondisclosure. At most, they incurred costs in negotiating the loan agreements, which costs are recoverable from defendant as discussed above. No other damages, however, flow from the nondisclosure itself (as opposed to the negotiation and actual signing of the Merger Agreement, which plaintiffs concede was within defendant's rights). Plaintiffs' contention that "[a]s a result of Alliance's non-disclosure, Plaintiffs made available $30 million, which funds could have been used elsewhere," PI. Mere. at 19, is disingenuous.

---

**2.** The Court expresses no opinion here as to whether defendant's merger with Bally constituted a triggering act for purposes of the termi-

nation provisions, as those provisions have been held to be ambiguous. *See supra.*

Plaintiffs were committed to making the $30 million available pursuant to the terms of the Letter agreement and received over one million dollars in consideration therefore. Even had defendant disclosed the ongoing negotiations with Bally, plaintiffs would have had an obligation to make the money available. That was the nature of their "commit[ment] to lend the Borrower an aggregate amount up to $30 million," which commitment terminated six months after signing the Letter agreement and not upon disclosure of defendant's negotiations. Having failed to plead any damages resulting from the non-disclosure, this cause of action must be dismissed.

Plaintiffs have also failed to allege facts giving rise to a duty to disclose. It is clear that under New York law a duty to disclose exists when a confidential, fiduciary or other "special" relationship exists among the parties. *Id.; George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.,* 114 A.D.2d 930, 495 N.Y.S.2d 408, 411 (1985); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.,* No. 89 Civ. 2809(BSJ), 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) at *4. Regular business relations, such as those at issue here, do not rise to the level of a special relationship without more. *See Success Universal,* 1996 WL, 535541 at *6 (arms-length transaction between buyer and seller not special relationship): *cf. Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir.1993) (bank-customer relationship generally does not give rise to fiduciary duty).

A duty to disclose can also arise "where one party possesses superior knowledge, not readily available to the other, and *knows that the other party is acting on the basis of mistaken knowledge.*" *Shamis,* 1996 WL 457320 at *5 (emphasis added). Plaintiffs argue that defendant had a duty to disclose because it had superior knowledge of certain information not readily available to plaintiffs and that plaintiffs were acting on the basis of such mistaken knowledge. Plaintiffs, however, fail to meet the second part of the "superior knowledge" test—i.e., they fail to allege that defendant knew (or should have known) that plaintiff was acting on the basis of the mistaken knowledge. Indeed, as discussed above, plaintiffs had an obligation to make the funds available to defendant, even if defendant was negotiating with Bally. Plaintiffs thus could not have acted any differently had they been aware of the negotiations. In the cases cited by plaintiffs, by contrast, it was reasonable for the non-disclosing party to presume that the other party would act differently if it were fully informed. *See Palmer v. A & L, Seamon, Inc.,* No. 94 Civ. 2968(JFK), 1996 WL 153946 (S.D.N.Y. April 2, 1996) (duty by company official to disclose terms of employee's contract to company, where company terminated employee based on lack of knowledge): *Shamis,* 1996 WL 457320 at *5 (duty to disclose third-party's deteriorating creditworthiness where plaintiff extended credit to third-party); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 45 (2d Cir.1991) (duty to disclose proper discount rate for golden parachute payment where plaintiffs reasonably relied on misrepresentations in choosing benefits); *Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 490–91 (1985) (fraud claim stated for failure to disclose serious deficiencies in mobile home park's sewer system); *cf. Swersky v, Dreyer and Traub,* 219 A.D.2d 321, 643 N.Y.S.2d 33, 37 (1996) (no duty to disclose unless one party's superior knowledge renders transaction inherently unfair). Whether viewed as a question of no duty to disclose, no reasonable reliance or lack of damages, the result is the same: because plaintiffs were obligated pursuant to the Letter agreement to make the funds available regardless of the ongoing negotiations with Bally, a cause of action for fraudulent concealment cannot stand.[3]

## IV. The Fourth Cause of Action: Indemnification

Plaintiffs seek indemnification based on the following clause in the Letter:

---

**3.** The Court notes that should plaintiffs have a good faith belief, consistent with the requirements of Rule 11, that defendant conducted negotiations with Bally prior to entering into the Letter agreement and never intended to enter into the loans to which plaintiffs committed, plaintiffs could amend their complaint to state a claim for fraudulent inducement and/or fraudulent concealment in the period prior to the execution of the Letter agreement. *See Ray Larsen Assocs.,* 1996 WL 442799 at *5 (discussing fraudulent concealment in pre-contracting period). The Court expresses no view as to the merits of such a possible claim.

The Borrower [defendant] hereby indemnifies and holds each Lender harmless from and against any and all claims, damages and liabilities (including all reasonable fees, expenses and disbursements of counsel) which may be incurred by or asserted against [a Lender] in connection with or arising out of any . . . litigation or proceeding arising out of or in connection with this letter agreement . . . whether or not . . . the Loans are made. . . . The Borrower shall pay all out-of-pocket expenses incurred by either or both of the Lenders in connection with this letter agreement . . . whether or not the Loans are made.

Letter at 5. Plaintiffs seek indemnification for (a) attorney's fees in this action and (b) the out of-pocket expenses they incurred with respect to the Letter and the loan negotiations.

In light of the general rule against shifting attorney's fees, a general indemnification clause is not deemed to encompass fees in an action brought by the indemnitee against the indemnitor unless "the intention to do so is unmistakably clear from the language" of the indemnification clause. *Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903 (1989). As in *Hooper,* the language here is not so "unmistakably clear", as the clause "is typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a third-party claim." *Id.; see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20–21 (2d Cir.1996).

Plaintiffs arc entitled to their out-of-pocket expenses, however, pursuant to the clear language of the Letter. Defendant's only argument to the contrary is that the ad damnum clause seeks only attorney's fees with respect to Count IV. The complaint alleges, however, that defendant is liable for such costs, Compl. ¶¶ 16, 35, and seeks "such other and further relief as to the Court may deem just and proper." Accordingly, the complaint states a claim for indemnification of plaintiffs' out-of-pocket expenses related to the Letter. Plaintiffs' fourth cause of action is dismissed insofar as it seeks attorney's fees in this action.

## CONCLUSION

For the reasons discussed above, defendant's motion is GRANTED with respect to plaintiffs' claims for breach of the duty of good faith and fair dealing (II), fraud (Ill) and indemnification of attorney's fees in this action (IV). Defendant's motion is DENIED with respect to plaintiffs' claims for breach of contract (I) and indemnification of expenses related to the Letter agreement and negotiating the terms of the loans (IV).

**SO ORDERED.**

### OPINION AND ORDER

Defendant has moved for reconsideration of so much of my opinion and order dated October 27, 1997 that denied defendant's motion to dismiss plaintiff's breach of contract claim. The motion for reconsideration is granted. Upon reconsideration, the Court adheres to its original decision.

SO ORDERED.