# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 10, 2010

No. 09-10554

Lyle W. Cayce
Clerk

HIGHLAND CRUSADER OFFSHORE PARTNERS LP; HIGHLAND
CREDIT STRATEGIES FUND; HIGHLAND DISTRESSED
OPPORTUNITIES INC; HIGHLAND FLOATING RATE ADVANTAGE
FUND; HIGHLAND FLOATING RATE LLC; RESTORATION
OPPORTUNITIES FUND; HIGHLAND CREDIT OPPORTUNITIES FUND
CDO LP; HIGHLAND FUNDS I, on behalf of its Highland High Income
Series,

Plaintiffs - Appellants

v.

LIFECARE HOLDINGS INC; LCI HOLDCO LLC; JP MORGAN CHASE
BANK, NA,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:08-cv-00102

Before DEMOSS, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-10554

Highland[1] appeals the district court's dismissal of its contract claims and grant of summary judgment on its tort claims in favor of LifeCare Holdings, Inc., LCI Holdco, LLC (collectively, "LifeCare"), and JP Morgan Chase Bank, N.A. ("JP Morgan").  We AFFIRM.

## I.  FACTS AND PROCEDURAL HISTORY

We recite the facts taking Highland's well-pleaded factual allegations as true and viewing the facts in the light most favorable to Highland.  LifeCare is owned by The Carlyle Group, a private equity firm.  Carlyle's original purchase of LifeCare was funded in part by a senior credit facility from a number of lenders, including Highland and JP Morgan, under a credit agreement dated August 11, 2005 (the "Credit Agreement").  Under the Credit Agreement, LifeCare was the borrower, Highland was a "Term B Lender," and JP Morgan was both a lender and LifeCare's administrative agent.[2]  The Credit Agreement provided the terms by which LifeCare was to repay its debt, and § 9.02 of the Credit Agreement allowed for those terms to be amended.  Under § 9.02, certain amendments could be made to the Credit Agreement if lenders holding more than 50% of the total loan commitment approved of the amendment.  LifeCare utilized this provision to pass two amendments to the Credit Agreement, and the

---

[1] Appellants include: Highland Crusader Offshore Partners LP; Highland Credit Strategies Fund; Highland Distressed Opportunities Inc; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Restoration Opportunities Funds; Highland Credit Opportunities Fund CDO LP; Highland Funds I, on behalf of its Highland High Income Series, Highland Crusader Offshore.  The Appellants will be collectively referred to as "Highland."

[2] There are two types of lenders under the Credit Agreement: (1) lenders with revolving commitments under the Revolving Credit Facility; and (2) lenders with term loan commitments under the Term Loan B Facility ("Term B Lenders").

No. 09-10554

passage of the second amendment (the "Second Amendment") is the subject of this litigation.

As an inducement to consent to the Second Amendment, LifeCare offered an incentive payment to all consenting Term B Lenders consisting of an amendment fee of 75 basis points (the "75 bps offer").[3] LifeCare's 75 bps offer was subject to two conditions: (1) LifeCare would only accept consents to the offer until the requisite vote was achieved; and (2) lenders consenting after that point would not be paid any amendment fees. LifeCare, through JP Morgan, posted the 75 bps offer in a secure digital workspace known as Intralinks, which only the lenders could access.[4]

A number of lenders, but not Highland, accepted LifeCare's 75 bps offer, bringing the total consenting to 47% (just shy of the 50% needed). Highland chose to monitor the offer's progress by collecting information on other lenders and tracking their positions on the proposal. On December 6, Highland, through its employee Mark Martinson, heard that LifeCare had increased its amendment fee offer to 125 bps to certain Term B Lenders. Martinson called Jackson Merchant at JP Morgan and questioned him about these higher offers. When Martinson asked Merchant directly whether other lenders were being offered 125 bps, Merchant stated that he could neither "confirm nor deny" that fact. Highland never consented.

Thereafter, LifeCare announced that it had obtained the requisite number of consents and that the window to consent to the 75 bps offer had closed.

---

[3] "75 basis points" refers to LifeCare's offer of an amendment fee equal to 0.75% of the aggregate loan commitments of each lender.

[4] LifeCare also used Intralinks to disseminate information about the first amendment.

No. 09-10554

LifeCare was able to obtain the requisite consents by offering an amendment fee of 125 bps to two Term B Lenders, Symphony Asset Management ("Symphony") and Quadrangle Group LLC ("Quadrangle").[5]  LifeCare and JP Morgan did not disclose on Intralinks the 125 bps offers it made to Symphony and Quadrangle or their acceptance.  After the requisite vote was achieved, LifeCare decided to pay all timely consenting lenders 125 bps, even though most of the lenders had consented at the 75 bps price.  Because Highland never consented, it never received the inducement payment consisting of the amendment fees.  This litigation ensued.

Highland initiated this lawsuit in Texas state court against LifeCare and JP Morgan, alleging that it was entitled to receive amendment fees because it would have consented to the Second Amendment if it had been offered 125 bps or became aware that other lenders were being offered 125 bps.  Highland further alleged that LifeCare and JP Morgan's failure to disclose the 125 bps offers: (1) breached § 3.12 of the Credit Agreement; (2) breached the implied covenant of good faith and fair dealing under New York law; (3) constituted fraud; (4) constituted conspiracy to commit fraud; (5) constituted aiding and abetting fraud; and (6) constituted negligent misrepresentation.

JP Morgan and LifeCare removed Highland's suit to federal court and then moved to dismiss Highland's claims under Federal Rule of Civil Procedure ("Rule") 12(b)(6). The district court granted LifeCare's and JP Morgan's motion to dismiss in part and dismissed Highland's breach of contract, breach of the

---

[5] Symphony owned 2.3% of the loan commitments, and Quadrangle owned 4.4%. Their ownership percentages combined with the 47% that LifeCare had already obtained allowed LifeCare to obtain the votes it needed to pass the Second Amendment without Highland's consent.

No. 09-10554

implied covenant of good faith and fair dealing, and aiding and abetting fraud claims. JP Morgan and LifeCare then moved for summary judgment on Highland's remaining claims, which the district court granted. This appeal followed.

## II. DISCUSSION

Highland appeals[6] the district court's Rule 12(b)(6) dismissal of its breach of contract and breach of good faith and fair dealing claims.[7] Highland also appeals the district court's grant of summary judgment on its fraud, conspiracy to commit fraud, and negligent misrepresentation claims.

A. Claims Dismissed Under Rule 12(b)(6)

Highland argues that the district court erred in dismissing its contract claims. Although this case invokes our federal question jurisdiction under 12 U.S.C. § 632, the parties do not challenge the district court's application of Texas's choice of law rules. The Credit Agreement contains an enforceable choice of law provision choosing New York law, and, because Texas would honor the agreement's choice of law provision, we find that New York law governs Highland's contract claims. *See Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) ("Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law

---

[6] This court reviews de novo a district court's dismissal under Rule 12(b)(6) as well as a grant of summary judgment. *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 438-39 (5th Cir. 2009) (citing *Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003)); *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 555 (5th Cir. 2008).

[7] Highland did not appeal the district court's dismissal of its aiding and abetting fraud claim. Accordingly, we do not consider it.

No. 09-10554

clause, the law of the chosen state must be applied."). Applying New York law, we affirm the district court's dismissal of Highland's contract claims.

1. Section 3.12 of the Credit Agreement

Section 3.12 contains the standard warranty that information furnished by each side in connection with the Credit Agreement was correct. Highland alleges that LifeCare and JP Morgan's failure to disclose the 125 bps offers breached § 3.12 because the failure to disclose rendered false or misleading their Intralinks offer of 75 bps. The district court rejected Highland's contention, finding that the representation found in § 3.12 only warranted the accuracy of written information furnished in connection with the negotiation of the original Credit Agreement and its attendant loan documents. We review the district court's interpretation of § 3.12 de novo. *Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 16 (N.Y. App. Div. 2008). In doing so, we must review the district court's interpretation of § 3.12 in light of the contract as a whole, *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007), and, if the parties' intent with respect to § 3.12 can be discerned from evidence found within the four corners of the document, the court must enforce the parties' intent as written, *see W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."). Applying these standards, we find no error in the district court's interpretation.

The text of § 3.12 and the relevant definitions of its terms all support the district court's interpretation. The representation found in § 3.12 is written in the past tense and warrants the accuracy of certain identified documents and other written information furnished in connection with the negotiation of "this

No. 09-10554

Agreement or any other Loan Document." The terms "this Agreement" and "Loan Document" are defined terms, and, when the original definitions of these terms are inserted into § 3.12, the section states, in relevant part, that it only applies to "written information . . . furnished . . . in connection with the negotiation of the Credit Agreement dated as of August 11, 2005 . . . the Guaranties, the Assumption Agreement and the Security Documents."[8] Neither § 3.12 nor the original definitions of "this Agreement" or "Loan Documents" mentions amendments to the Credit Agreement, even though the parties clearly contemplated such amendments, as evidenced by § 9.02. Moreover, according to their definitions, "the Guaranties," "the Assumption Agreement," and "the Security Documents" were all documents that were attached as exhibits to the Credit Agreement on August 11, 2005, a fact that further supports the district court's interpretation. We find no basis to reverse on this claim.

2. Covenant of good faith and fair dealing

Highland also alleges that the manner in which LifeCare and JP Morgan negotiated the Second Amendment breached the Credit Agreement's implied covenant of good faith and fair dealing. Under New York law, every contract contains an "[i]mplied . . . covenant of good faith and fair dealing, which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits [it contracted for] under their agreement."

---

[8] Highland argues that the first and second amendments' redefinition of the term "this Agreement" to mean "the Credit Agreement, as amended by this Amendment," shows that the parties intended § 3.12 to apply to amendments to the Credit Agreement. While amendments to the Credit Agreement do become part of the agreement itself, this redefinition of the term "this Agreement," in light of the evidence above, does not show that the parties intended § 3.12 to apply to amendments.

*Jaffe v. Paramount Commc'ns, Inc.*, 644 N.Y.S.2d 43, 47 (N.Y. App. Div. 1996) (citation omitted); *see Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 838 N.Y.S.2d 536, 538 (N.Y. App. Div. 2007); *see also Dalton ex rel. Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995).  Highland alleges that LifeCare and JP Morgan's actions deprived it of the opportunity to be compensated for amendments to the Credit Agreement.  The Credit Agreement, however, expressly allows amendments such as this one to be made without all parties consenting and further does not provide that each consenting party must be the subject of equal inducements to consent.  Highland's argument would result not in a "fair play" standard being applied but rather a wholesale rewriting of the contract to grant it a benefit for which it did not bargain.[9]  Because Highland has failed to plead that LifeCare's and JP Morgan's actions deprived it of any benefit that it bargained for in the Credit Agreement, we find that the district court properly dismissed Highland's good faith claim.  *See Jaffe*, 644 N.Y.S.2d at 47-48 (finding that a plaintiff's good faith claim was properly dismissed because "plaintiff failed to allege any facts to demonstrate that [the defendant] deprived him of any rights he had under the Agreement").

B. Claims Disposed of on Summary Judgment

Highland also appeals the district court's grant of summary judgment on its fraud, negligent misrepresentation, and conspiracy to commit fraud claims.

---

[9] For this same reason, Highland's arguments regarding course of dealing and industry custom fail.  Highland argues that the Credit Agreement is "silent" as to whether LifeCare and JP Morgan had to give notice of the 125 bps offer on Intralinks and, therefore, the district court had to consider extrinsic evidence allegedly showing that such notice was required. Under New York law, a court may "not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001).

No. 09-10554

As stated earlier, Texas's choice of law rules apply to this case, and, after applying those rules, we find that Texas law governs the extracontractual claims. Under Texas law, we find that the district court properly granted summary judgment on Highland's fraud, negligent misrepresentation, and conspiracy to commit fraud claims.

1. Fraud and Negligent Misrepresentation

Highland claims that LifeCare and JP Morgan are liable for fraud and negligent misrepresentation for representing that all Term B lenders were being offered 75 bps when in reality some lenders were being offered 125 bps. Highland further alleges that it justifiably relied on LifeCare and JP Morgan's false or misleading representation in deciding not to consent to the 75 bps offer. Justifiable or reasonable reliance is an element of both fraud and negligent misrepresentation. *See Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 896-97 (Tex. App.-San Antonio 2002, no pet.) (stating that if a party knows that a representation is false before acting upon it, he cannot reasonably rely on the misrepresentation and has no claim for fraud or negligent misrepresentation); *see also Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 358 (5th Cir. 1996) ("[U]nder a claim for negligent misrepresentation, the plaintiff must prove 'justifiable reliance' on the misrepresentation."); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) ("To prevail on its fraud claim, [a plaintiff] must prove that: . . . (4) [it] actually and justifiably relied upon the representation . . . .").

The undisputed summary judgement evidence shows that Highland collected information on other lenders and learned that LifeCare and JP Morgan had made offers of 125 bps to other lenders before the window for accepting the

75 bps offer closed.  In the trial court, Highland stipulated that one of its employees, Martinson, actively "collected and updated . . . information he obtained on other Lenders' positions regarding the proposed second amendment in an electronic tracking sheet."  Martinson testified during his deposition that he learned of the 125 bps offers and questioned JP Morgan about the offers when Highland still had an opportunity to accept the 75 bps offer.  Martinson further testified that, when he asked JP Morgan directly about the 125 bps offers, JP Morgan stated that they could neither confirm nor deny whether such offers were made.

Based on Highland's own stipulation and the undisputed testimony of Martinson, no reasonable jury could find that Highland justifiably relied on LifeCare and JP Morgan's alleged misrepresentation because its own investigation of the facts negated any reasonable reliance upon the supposed misrepresentations. *See Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 311 (Tex. App.–Fort Worth 1993, no writ) ("[W]hen a person makes his own investigation of the facts, and knows the representations are false, he cannot, as a matter of law, be said to have relied upon the misrepresentations of another."). Accordingly, we find that the district court properly granted summary judgment on Highland's fraud and negligent misrepresentation claims.

2. Conspiracy to Commit Fraud

Highland's conspiracy claim is derivative of its fraud claim. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).  Because we find that summary judgment was properly granted as to Highland's fraud claim, we find that summary judgment was also properly granted as to Highland's conspiracy claim. *See Cmty. Initiatives, Inc. v. Chase Bank of Tex.*, 153 S.W.3d 270, 285 (Tex.

No. 09-10554

App.–El Paso 2004, no pet.) ("[I]f [a] plaintiff fails to raise a fact question as to the liability of at least one of the defendants for an underlying tort, it is proper to render a summary judgment against the plaintiff on a civil conspiracy claim.").

## III. CONCLUSION

For the foregoing reasons, we AFFIRM.