Michelle WILSON, Plaintiff,

v.

NORTHWESTERN MUTUAL
INSURANCE COMPANY,
Defendant.

No. 07 Civ 02790 (WGY).

United States District Court,
S.D. New York.

March 26, 2009.

Douglas R. Dollinger, Newburgh, NY, Douglas Dollinger, Solo Pract., Goshen, NY, for Plaintiff.

Norman Louis Tolle, Rivkin Radler, LLP, Uniondale, NY, for Defendant.

## Memorandum and Order

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

Michelle Wilson ("Wilson") brings this claim as the intended beneficiary of two life insurance policies between her late husband Kenneth Wilson ("Kenneth") and defendant Northwestern Mutual Life Insurance Company ("Northwestern Mutual"),[2] seeking the proceeds of those policies. She alleges that Northwestern Mutual breached the policies by not paying proceeds, misled and deceived her, violated New York's General Obligation and State Insurance Laws, and was negligent. She demands $500,000 as well as costs and attorneys' fees. See First Amended Complaint [Doc. 19 Attach. 1].

The undisputed record shows that Kenneth cancelled the policies because of a $35 fee and unexpectedly died shortly thereafter. He was thirty-six years old and the father to two young children. Northwestern Mutual refused to pay the proceeds, concluding that the policy terminated before Kenneth's death. On that ground, it now moves for summary judgment on Wilson's breach of contract claim, and argues that it is entitled to summary judgment on

her other claims as well. Wilson responds that for several reasons, Northwestern Mutual did not cancel the insurance policies properly.

### A. Procedural Posture

After Wilson, on March 7, 2007, filed her complaint in the Supreme Court of New York, County of Westchester [Doc. No. 1 Attach. 1], Northwestern Mutual removed it to the United States District Court for the Southern District of New York on the basis of diversity jurisdiction. [Doc. No. 1]. A number of motions followed, including Northwestern Mutual's motion to dismiss Wilson's demands for compensatory damages and attorneys fees [Doc. No. 3], Wilson's motion for joinder and remand [Doc. No. 5], and Wilson's motion to amend or correct the complaint [Doc. No. 7]. All were denied by Judge Brieant on May 18, 2007 after a hearing. [Doc. No. 13]. Wilson filed an amended complaint, dated May 23, 2007, sometime in late May or early June, 2007. [Doc. No. 14].

Northwestern Mutual moved for summary judgment on January 31, 2008, [Doc. No. 18] supported by a memorandum of law ("NM Mem.") [Doc. No. 20], a Rule 56.1 statement ("NM Facts") [Doc. No. 21], and several affidavits and exhibits. [Doc. No. 19]. Wilson moved for summary judgment on February 25, 2008, [Doc. No. 22], supported by a memorandum of law ("Wilson Mem.") [Doc. No. 22 Attach. 1]. Each party's opposition and reply then followed: Northwestern's opposition to Wilson's motion on February 29, 2008 ("NM Opp'n") [Doc. No. 25], Wilson's opposition on the same day ("Wilson Opp'n") [Doc. No. 27], Northwestern Mutual's Reply on March 14, 2008 ("NM Reply") [Doc. No. 28], and Wilson's Reply on March 16, 2008 ("Wilson Reply") [Doc. No. 30].

---

**1.** Of the District of Massachusetts, sitting by designation.

**2.** Wilson mistakenly named the defendant as Northwestern Mutual Insurance Company.

On March 16, 2008, Wilson moved for leave to re-file her pleadings to conform with local rule 56.1, because she had failed to include a statement of facts or to reply to Northwestern Mutual's statement of facts. [Doc. No. 31]. Judge Brieant heard oral argument on March 28, 2008, granted Wilson's motion to amend, and scheduled further argument on the motions for summary judgment for May 23, 2008. Wilson filed her Rule 56.1 statement on April 28, 2008, ("Wilson Facts") [Doc. No. 32], and submitted a reply to Northwestern Mutual's statement the same day. [Doc. No. 33]. Northwestern responded on May 6, 2008. [Doc. No. 34].

The case was reassigned to this Court on December 1, 2008. [Doc. No. 36].

### B. Undisputed Facts

On May 29, 2004, Northwestern Mutual issued two life insurance policies to Kenneth: a whole life policy ("Whole Life Policy") with a face amount of $150,000, NM Facts at ¶ 1, and a term policy ("Term Policy") in the amount of $350,000. NM Facts at ¶ 2; Wilson Facts ¶ 2. Kenneth elected to pay the premiums on a monthly basis from an Insurance Service Account ("ISA"), which was to be funded though electronic transfers from his bank account. NM Facts at 3; Wilson Facts ¶ 5; ISA PLUS Request form [Doc. No. 19, Attach 19]. Each policy provided for a grace period for late premium payments:

A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The policy will be in full force during this period. If the Insured dies during the grace period, any overdue premium will be paid from the proceeds of the policy.

If the premium is not paid within the grace period, the policy will terminate as of the due date. . . .

See Whole Life Policy at § 4.1 [Doc. No. 19 Attach. 17]; Term Policy at § 3.4 [Doc. No. 19 Attach. 18]. See also NM Facts at ¶ 4; Wilson Facts ¶ 6. Each further provided for reinstatement of the policy more than thirty-one days after the end of the grace period upon submission of evidence of insurability and payment with interest of unpaid premiums. Whole Life Policy at § 4.4; Term Policy at § 4.

In 2004, the monthly premium payments on the Whole Life Policy were $203.92, and on the Term Policy, $20.93. See Prince Affidavit [Doc. No. 19 Attach. 16] at ¶ 12. Kenneth did not always pay on time. On four occasions between August 2004 and early 2005, electronic funds transfers to the ISA were rejected by Kenneth's bank for insufficient funds and the ISA was closed. Prince Affidavit [Doc. 19 Attach. 16] at ¶¶ 11–18. On three of the occasions, Kenneth made a subsequent electronic funds transfer payment, the ISA was re-opened, and the premiums were paid. *Id.*

On the fourth occasion, in March 15, 2005, the ISA again was closed due to lack of funds. At that time, the premiums had been paid to January 29, 2005. Prince Aff. at ¶ 18. The ISA was reopened on April 5, 2005 with an electronic funds transfer payment of $224.85, but payment of the premiums for the months of February, March, and April 2005 resulted in a negative balance in the ISA. *Id.* at 19. The payments for February and March were reversed on April 7, 2005, and on April 12, 2005, both policies were removed from the ISA and it was closed.[3] *Id.* at ¶¶ 19–21 & Ex. N. [Doc. 19 Attach. 21].

**3.** Wilson denies this fact, and challenges the affidavit tendered in support of it from Cylvia Prince, a Research Specialist in Northwestern Mutual's Research Division. In that affidavit, Prince explains that she is "familiar with" the life insurance policies and ISAs issued by Northwestern Mutual and that her testimony is based on "the business records regularly maintained by Northwestern Mutual in the course of its business." Prince Affidavit ¶ 3. Wilson argues that the Prince Affidavit and attached exhibits, particularly M and N, must

This time, however, Kenneth did not merely pay the delinquent payments. Instead, on April 27, 2005, he called Northwestern Mutual, spoke with Melissa Nowak in the Policyowner Services Department, and asked to have the ISA reopened for only the Term Policy.[4] Getschman Affidavit [Doc. 19 Attach 23] at ¶ 4. He further asked that the premium for that policy be paid through December 29, 2005, and provided his bank account information for the one-time draft. *Id.* The ISA was reactivated, with the Term Policy only, on April 28, 2005. Prince Affidavit ¶ 22. On April 29, 2005, the ISA received an electronic funds payment of $215.60, covering the ten monthly periods from March 29 thru December 29, 2005. *Id.* at ¶ 23.

What happened next is the crux of the case. On May 9, 2005, a premium adjustment of $35 resulted in a negative balance in Kenneth's ISA. Prince Affidavit ¶ 24. When Kenneth called Northwestern Mutual on May 23, 2005, he learned from Diane Knueppel, a Senior Customer Service Representative, that he had been charged the $35 fee because his Term Policy was no longer a companion policy to a whole life policy, and thus he was no longer eligible for a waiver of the $35 fee.[5] Knueppel

---

be excluded. Wilson Reply at 5. The admissibility of each document on summary judgment is governed by Rule 56(e)(1) of the Federal Rules of Civil Procedure, which provides that affidavits supporting or opposing summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

Exhibit M [Doc. 19 Attach. 20] is, in Prince's words, the "financial history for the Wilson ISA," "maintained by Northwestern Mutual in the regular course of its business" and as "part of Northwestern Mutual's regular business practice." Prince Affidavit ¶ 11. Exhibit M is within the exception for business records set forth in Rule 803(6) of the Federal Rules of Evidence.

Exhibit N [Doc. 19 Attach. 21] is an "Account History" that Prince created after reviewing Exhibit M. Prince Affidavit ¶ 11–¶ 12. Wilson argues that it must be excluded because "data prepared or compiled for use in litigation are not admissible as business records within the meaning of Rule 803(6)." Wilson Reply at 5. The difficulty for the Court is that Prince has not explained when or why she prepared the Account History, i.e., whether it was in the regular course of business or only in anticipation of litigation, which impairs this Court's analysis of whether "the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Wilson did not object to Exhibit N until her reply brief, and Northwestern Mutual has not responded to her argument. Even so, it is Northwestern Mutual's burden to demonstrate admissibility and it has not done so. Exhibit N is stricken.

4. Wilson denies this fact, objecting that the case notes attached to Getschman's affidavit are inadmissible. Wilson Reply to NM Facts ¶ 6. While Getschman does not have personal knowledge of the conversation between Kenneth and Nowak, she stated in her affidavit that it was "based on the business records regularly maintained by Northwestern Mutual in the course of its business," in particular, notes in the Casetracker system created by Nowak on the day she spoke with Kenneth. Getschman Affidavit ¶ 2. Getschman explained that "it was the practice in 2005 of Northwestern Mutual to have those persons who worked in the Policyowner Services Department memorialize their telephone conversations." *Id.* ¶ 3. Nowak's case notes [Doc. 19 Attach. 24] are admissible. *See Searles v. First Fortis Life Ins. Co.*, 98 F.Supp.2d 456, 461–62 (S.D.N.Y.2000) (concluding that business documents attached to affidavit of benefits specialist memorializing conversations in course of her investigation were admissible).

5. Wilson makes the same objection to Knueppel's affidavit as he did to Getschman's, *see* note 4, *supra*, and it is rejected for the same reason. *See* Wilson Reply to NM Facts ¶¶ 9–10. His insinuation that Knueppel's Casetracker notes are fabricated, *see* Wilson Reply at 7–8, is not supported by the record. It is not seriously disputed that the July 2006 letter from Northwestern Mutual was prepared upon review of these notes.

Affidavit [Doc. No. 19 Attach. 5] at ¶ 5. Learning about this fee for some reason caused Kenneth to want to cancel the policy. What happened next is a key dispute between the parties. Knueppel testifies by affidavit that Kenneth asked her to "refund his last premium payment for the term life policy and let the policy lapse." Knueppel Affidavit ¶ 5. She relies on a note she created that same day in Northwestern Mutual's Casetracker system, *see* Knueppel Affidavit Ex. B [Doc. 19 Attach. 7], which contains the following: "Spoke with client. Informed him that the $35 is a policy fee that . . . is no longer waived. Client is now asking to be refund [sic] his last payment and let the policy lapse." After checking with Kenneth's Northwestern Mutual Field Representative, Daniel Stein, Knueppel called Kenneth and confirmed that she would refund "the last draft that was done on the ISA.". Knueppel Affidavit ¶ 8 & Ex. C [Doc. 19 Attach. 8]. To her, this meant she would refund the electronic funds transfer payment in the amount of $215.60 that was received on April 29, 2005 for premiums for the months of March through December. Knueppel Affidavit ¶ 8.

In addition to challenging Northwestern Mutual's reliance on unauthenticated business records, *see* note 4, *supra*, Wilson contends that, at best, the records "indicate that Mr. Wilson stated that he wanted a refund of the payments for June through December 2005, the remaining payments in his ISA." Wilson Reply to NM Facts ¶ 11. In other words, Wilson argues that Knueppel misunderstood Kenneth's request.

On May 23, 3005, Knueppel reversed the premiums for May through November, 2005, closed the ISA as of May 29, 2005, and refunded the account balance ($154.07) to Kenneth by check dated May 31, 2005. *Id.* at ¶ 9; Prince Affidavit at ¶ 25. On or

about that same day, Northwestern Mutual sent Kenneth a notice that his Term Policy was paid to May 29, 2005, and that the grace period would expire on June 29, 2005. Wilson Facts ¶ 7.

Once the ISA was closed, Knueppel could not reverse (according to her affidavit) the payments for the months prior to May, and instead asked Northwestern Mutual Senior Analyst Joyce Barrack to reverse the payments for the months of March, April and May 2005. Knueppel Affidavit ¶ 10. When Barrack had done so, Knueppel, on May 31, 2005, mailed a refund check to Kenneth in the amount of $81.03. *Id.* at ¶¶ 11; 13. She memorialized each of these conversations and actions in Northwestern Mutual's Casetracker system, in accordance with her usual practice. *Id.* ¶¶ 4–12. Northwestern Mutual never explicitly rescinded the letter dated May 23, 2005, which stated that Kenneth's grace period expired on June 29, 2005. NM Response to Wilson Facts ¶ 8.

Kenneth died on or about June 6, 2005. *See* Amended Complaint ¶ 9. Wilson then submitted a claim for payment on the policies, *see* Wilson Facts ¶ 11, which Northwestern Mutual denied. *Id.* at 12.

Wilson received the first refund check—for $154.07—after Kenneth's death, *see* Wilson Facts ¶ 10, and says she did not receive the second refund check. *See* Wilson Reply to NM Facts ¶ 18. Northwestern Mutual has submitted a check register showing that on May 31, 2005 it caused a check to be issued in the amount of $81.03, payable to Kenneth Wilson, Knueppel Affidavit ¶ 13 & Ex. G, and has submitted an affidavit of Northwestern Mutual's Print/Mail Support Specialist stating that the check was printed and mailed to Kenneth in accordance with usual business practices.[6] *See* Ahangar Affidavit [check]. Northwestern Mutual admits, however,

---

6. New York law provides that when "there is proof of the office procedure followed in a

regular course of business, and these proce-

that the check for $81.03 was never deposited by Wilson or returned to Northwestern Mutual's bank for cancellation. NM Response to Wilson Facts ¶ 10.

### C. Federal Jurisdiction

This Court has jurisdiction over this action on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332.

## II. ANALYSIS

### A. The Whole Life Policy

Taking all inferences in favor of Wilson, as this Court must, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Whole Life Policy terminated effective February 28, 2005. The following facts are not disputed: Kenneth specifically instructed Northwestern Mutual not to include the Whole Life Policy when his ISA was reopened on April 27, 2005, he had paid the premiums on that policy only through February 28, 2005, and he made no premium payments on that policy during its thirty-one day grace period.

Wilson contends, however, that she is entitled to proceeds under the Whole Life Policy because it was never properly cancelled. She relies on New York Insurance Law § 3211(a)(1), which requires insurers, except in certain circumstances, to issue a written notice of cancellation prior to terminating a life insurance policy for a default in payment of a premium. The hurdle that proves too high for Wilson, however, is that Kenneth expressly elected to pay his premiums on a monthly basis, *see* ISAPLUS Request, Prince Affidavit Ex. L [Doc. No. 19 Attach. 19], and there is an exception in the law for "[a]ny policy of insurance requiring the payment of premiums monthly or at shorter inter-

vals." § 3211(f)(2). *See also Gerold v. Companion Life Ins. Co.*, 31 A.D.3d 378, 819 N.Y.S.2d 276, 278 (2d Dep't 2006) ("defendant was not required to notify the plaintiff that the policy lapsed because the insured elected to pay the premiums on a monthly basis."). To attempt to demonstrate that Kenneth's premiums were due in longer intervals, Wilson relies on language in the Whole Life Policy providing that premiums may be paid on any frequency approved by the Company, *see* Whole Life Policy § 4.1, and, pointing to an April 2005 premium notice demanding three months of payments, contends that Northwestern Mutual "agreed to accept payments on each policy at different frequencies including either monthly, quarterly, or annual basis." Wilson Facts ¶ 4; Wilson Mem. at 32. As Northwestern Mutual explains, however, the premium notice showed a due date of February 28, 2005 (and thus a one-month interval) and requested three months of premiums only because the prior two months had not been paid. NM Response to Wilson Facts ¶ 4.

Similarly unpersuasive is Wilson's argument that Kenneth's ISA account "was billed quarterly and was billed internally monthly," i.e., electronic funds transfers were made from his bank account to his ISA account on a monthly basis, but in fact payments were withdrawn from his ISA account quarterly. *See* Wilson Reply at 7 n. 3. Assuming this is true, Wilson argues that Kenneth's policy was not a "policy of insurance requiring the payment of premiums monthly or at shorter intervals" and thus was not governed by the exception in section 3211(f)(2). Upon the records she has submitted, *see* Exhibit N [Doc 19 Attach. 21],[7] however, no reasonable fact

---

dures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received. The mere denial of receipt does not rebut that

presumption." *Meckel v. Continental Res. Co.*, 758 F.2d 811, 817 (2d Cir.1985).

**7.** Oddly, Wilson here relies on the Account History created by Prince. She has success-

finder could agree with Wilson. In the brief period that Kenneth had policies with Northwestern Mutual, lasting less than a year, his ISA account was closed for insufficient funds on at least four occasions. Each time his account was reopened, he was required to make delinquent payments. As a result, there is no decipherable pattern in his account history.

Wilson further contends that Northwestern Mutual has failed to "mail a written notice within six months after termination or lapse to the insured or to any other person who shall have been designated in writing to receive such notice, stating the type and amount of any automatic nonforfeiture benefit in force," as required for policies, like this one, that are exempt pursuant to New York Insurance Law § 3211(f)(2). Wilson Mem. at 33. Northwestern Mutual has not responded to this argument. NM Opp'n at 5–8; NM Reply at 4–6. The notice purpose behind the statute is lacking here, however, where Wilson made a claim for the proceeds shortly after Kenneth's death, and certainly was not left in the dark about the policy's status. The parties have not made clear to the Court exactly what occurred when Wilson submitted her claim, i.e., there are no documents explicitly denying that claim with respect to the Whole Life Policy and the only document pertaining to the Term Policy is dated July, 2006, more than a year after Kenneth's death. But there no doubt were conversations between Wilson and Northwestern Mutual about the status of her request. This is not a case where a policy was terminated without notice to the insured.

## B. The Term Policy

The key question is whether the Term Policy was in effect when Kenneth died on June 6, 2005. In support of her position that it was, Wilson contends that there is a question of fact whether Kenneth directed Knueppel to refund his premium payments back to February 2005 (or whether he in fact intended only to cancel the premium payments going forward), and argues that even if there was such an agreement, it was a modification of a specific term of the policy and was void because it was not in writing. Wilson Mem. at 8, 11–18. Further, Wilson argues that Northwestern Mutual cannot meet its burden at trial without the testimony of Knueppel, who, it argues, should be excluded pursuant to New York's Dead Man Statute.

1. Was the oral agreement between Kenneth and Knueppel, assuming it occurred, a modification of the contract that was required to be in writing?

■ Wilson contends that the oral agreement between Kenneth and Knueppel on May 23, 2005 (which it claims modified the terms of the policy), is unenforceable because it violated three state laws: New York General Obligation Law § 15–301, requiring written waiver of a contractual written notice requirement;[8] New York Insurance Law § 3204, prohibiting the oral modification of insurance agreements other than by an instrument signed by the party to be charged with the modification; and New York General Obligations Law § 5–701, the Statute of Frauds.[9] Wilson Mem. at 13–16. To reach those arguments, however, the Court first must

---

fully objected to the admissibility of this exhibit. *See* note 3, *supra*.

**8.** The Term Life policy had such a requirement: "A change in the policy is valid only if it is approved in writing by an officer of the Company." Term Policy § 1.3.

**9.** Northwestern Mutual argues that the Court must disregard Wilson's arguments pertaining to New York Insurance Law § 3204 and General Obligations Law § 5–701 because they were not alleged in her complaint. *See* NM Opp'n at 10 n. 1. In light of the Court's analysis, however, the objection is of no moment.

agree that the agreement between Kenneth and Knueppel was a modification of the contract. It does not.

Wilson contends that the agreement modified the terms related to "the Policy's express grace period of 31 days," and the "premium due date." Wilson Mem. at 11. Wilson has failed, however, to show how those terms were altered. NM Opp'n at 8–9. She has pointed to no explicit term in the Term Policy that Kenneth's request violated.

### 2. Is there is a triable issue of fact as to what Kenneth asked Knueppel to do?

Wilson contends that "it is not at all clear whatsoever from the content contained in the [Knueppel's] notes, even assuming that there was oral an [sic] agreement to terminate-cancel the Term Policy, whether Mr. Wilson made any agreement to modify the terms of the Policy beyond 'refunding his last payment' as to May 29, 2005, as opposed to the claim that a refund was being made to his last 'draft' with a retroactive termination to February 28, 2005." (Emphasis removed). Wilson Opp'n at 14. *See also* Wilson Mem. at 17–18 ("it is not at all clear from the documentary evidence submitted … whether [Kenneth] made any agreement to modify the term of the Policy beyond backdating his 'last payment' of May 2005 as evidence by the premium refund check of $154.07 representing the months of June 2005 through December 2005."). The obstacle for Wilson is the lack of any record evidence supporting her version of the agreement between Kenneth and Knueppel— that Kenneth in fact sought only the refund of his payments for May onward, and not back to February. Of course, this makes all the difference, as under Wilson's

version Kenneth died during the grace period and was covered. Wilson attempts to climb over this obstacle by striking any consideration of Knueppel's testimony to the contrary, arguing that she is incompetent and not credible.[10] Because the Court concludes that she is competent, as discussed below, and because "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)), Wilson has failed her burden under the summary judgment standard. Northwestern Mutual has offered evidence to disprove the existence of a contract at the time of Kenneth's death, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Wilson has failed to "go beyond the pleadings, and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." *Id.* at 323, 106 S.Ct. 2548 (internal quotation marks omitted). No reasonable jury could return a verdict for Wilson. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 ("plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment … from which a jury might return a verdict in his favor.").

### 3. Is Knueppel competent to testify?

■ Wilson contends that Northwestern Mutual's business records are inconclusive as to the backdating of the Term Policy to February 2005 without the testimony of Knueppel, which, she argues, is inadmissible because Knueppel is not competent to testify pursuant to New York's so-called "Dead Man's Statute," New York C.P.L.R. § 4519.[11] Wilson Opp'n at 18–19. New York C.P.L.R. § 4519 provides:

---

**10.** With respect to credibility, Wilson contends that Knueppel's "statements make absolutely no sense whatsoever." Wilson reply at 6.

**11.** Federal courts must apply state law pertaining to witness competency. *See* Fed. R.Evid. 601.

Upon the trial of an action or the hearing upon the merits of a special proceeding, *a party or a person interested in the event,* or a person from, through or under whom such a party or interested person derives his interest or title by assignment or otherwise, *shall not be examined as a witness in his own behalf or interest,* or in behalf of the party succeeding to his title or interest *against* the executor, administrator or survivor of a deceased person or the committee of a mentally ill person, or *a person deriving his title or interest from, through or under a deceased person* or mentally ill person, by assignment or otherwise, *concerning a personal transaction or communication between the witness and the deceased person.*

New York C.P.L.R. § 4519 (emphasis added).

Northwestern Mutual first responds that the statute does not apply to insurance disputes because, as the Second Circuit held in *Ward v. New York Life Ins. Co.,* 225 N.Y. 314, 319–20, 122 N.E. 207 (1919), life insurance proceeds do not come "from, through or under a deceased person" because they are not owned by an insured in his lifetime. NM Reply at 11. There the court, applying Code Civ. Pro. § 829, the predecessor to New York C.P.L.R. § 4519, concluded that it was error to exclude as incompetent a plaintiff's testimony that her husband told her he had assigned to her his life insurance policy. *Id.* The court concluded that the evidence was competent as against the respondent beneficiaries of the policy, noting: "we do not think that a person claiming money directly from an insurance company by virtue of a designation under a policy can be said to be claiming 'from, through or under' the insured in said policy even though the latter made the designation." *Id.* As acknowledged

by the Court of Appeals of New York in *Poslock v. Teachers' Retirement Board of Teachers' Retirement System,* 88 N.Y.2d 146, 152, 643 N.Y.S.2d 935, 666 N.E.2d 528 (N.Y.1996), the *Ward* decision "has stood the test of time, common-law developments and legislative change."

Wilson responds that *Ward* was limited to its facts, and that this case is more like *Poslock, supra,* where the Court of Appeals held that the above exception to the Dead Man's Statute did not apply to testimony about pension and retirement rights and proceeds that belonged to and were manageable by a decedent during his lifetime. Wilson argues that here, as well, the proceeds belonged to Kenneth during his lifetime because he could receive dividends under the policy. Wilson Reply at 9. The Term Policy expressly provides, however, that "it is not expected that any dividends will be paid." Term Policy § 5.1 [Doc. 19. Attach 18]. Moreover, the unlikely receipt of dividends does not begin to compare to the degree of control possessed by the *Poslock* decedent. *See Poslock,* 88 N.Y.2d at 152, 643 N.Y.S.2d 935, 666 N.E.2d 528 ("During his lifetime, Poslock had the option to direct where his contributions would be invested, . . . was eligible at any time to borrow at a favorable rate of interest up to 75% of the combined sum of the funds invested in a variable annuity savings fund and the amount of his accumulated deductions" and would have received the full amount of his accumulated deductions upon termination).

Having concluded that Knueppel's testimony comes within an exception to the Dead Man's Statute, the Court need not consider Northwestern Mutual's alternative argument, that the Dead Man's Statute does not apply because Knueppel is not "interested in the event." NM Opp'n at 18–20. Moreover, Wilson, as the party

challenging Knueppel's competency, bears the burden of proving that Knueppel's testimony should be excluded. *See Stay v. Horvath,* 177 A.D.2d 897, 899, 576 N.Y.S.2d 908 (N.Y.A.D.1991). Wilson must demonstrate that Knueppel "will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action." *In re Estate of Rosenblum,* 284 A.D.2d 820, 821, 727 N.Y.S.2d 193 (N.Y.A.D.2001). Wilson's only assertion pertaining to Knueppel's interest, however, is that her affidavit "fails to provide[ ] any background or to determine [her] ownership interest in Northwestern Mutual." Wilson's Reply at 9. Such speculation is insufficient to sustain her burden.

### 4. Other issues

There are a few issues remaining, the resolution of which favors Northwestern Mutual.

### a. Effect of Kenneth's failure to deposit the second refund check

■ Wilson contends that Kenneth's failure to cash the policy refund checks prior to his death revoked his termination of the policy. Wilson Mem. at 27. In support, Wilson argues that Northwestern Mutual's offer to backdate and terminate the policy was revocable because it was not in writing, no consideration was given or received, and it was not in such form as to make the promise binding. She further contends that the final determination was placed with Kenneth, and that his death terminated the revocable offer because it was impossible for him to accept. *Id.* at 28; Wilson Opp'n at 20. Knueppel did not, however, make an offer of contract to Kenneth. Instead, Kenneth requested to terminate an existing contract, which request was not, by the terms of the contract, required to be in writing. *See* NM Opp'n at 20; NM Reply at 17.

### b. Effect of Notice dated May 23, 2005

Wilson's next argument pertains to the notice from Northwestern Mutual dated May 23, 2005, informing Kenneth that his ISA had been closed and that his grace period ended June 29, 2005. [Doc. No. 19 Attach 4 at 17]. Northwestern Mutual explains that the notice was generated automatically when Knueppel closed the ISA and admits that it never rescinded the notice. NM Response to Wilson Facts ¶¶ 7–8. Wilson contends that "[c]onstruing the communication strictly against the insurer and favorably for the insured compels the conclusion, assuming Mr. Wilson received the May 23, 2005 letter prior to his death that Mr. Wilson reasonably believed that Northwestern was offering him the chance to keep the policy at his option." Wilson Mem. at 31.

■ Wilson's argument strains any reasonable application of contract law. Applying Knueppel's uncontroverted testimony regarding Kenneth's request—that Kenneth directed Northwestern to refund his premium payments back to February—Kenneth could not reasonably have construed this notice as an offer, and could not have relied on it to his detriment. NM Opp'n at 21; NM Response to Wilson Facts ¶¶ 7–8.

### C. Deceptive Business Practices

To prove a deceptive business practice under New York General Business Law § 349, Wilson must prove that Northwestern Mutual engaged in a consumer-oriented act or practice that was misleading in a material way and injured her. *See Citipostal, Inc. v. Unistar Leasing,* 283 A.D.2d 916, 918, 724 N.Y.S.2d 555 (N.Y.App.Div. 2001). Wilson points to "the act of orally backdating termination-cancellation dates," which, she argues, "involves bad faith concerning a material omissions [sic] to the rights of insured and beneficiaries intend-

ed to deny any recovery under the policy." Wilson Opp'n at 29; *see also* Wilson Reply at 1. Northwestern Mutual responds that Wilson's allegations pertain only to its specific dealings with Kenneth and not to broader consumer-oriented behavior, and therefore even accepting their truth, they do not fall under the statute. NM Reply at 19. *See Gaidon v. The Guardian Life Ins. Co. of America,* 94 N.Y.2d 330, 344, 704 N.Y.S.2d 177, 725 N.E.2d 598 (N.Y.A.D.1999) ("As a threshold matter, in order to satisfy General Business Law § 349 plaintiffs' claims must be predicated on a deceptive act or practice that is 'consumer oriented'. We hold that they are. In contrast to a private contract dispute as to policy coverage, the practices before us involved an extensive marketing scheme that had 'a broader impact on consumers at large.'") (internal citations omitted). As there is no evidence that Northwestern Mutual deceived Kenneth (or Wilson), the Court need not reach this issue.

## III. CONCLUSION

The Court GRANTS Northwestern Mutual's motion for summary judgment [Doc. No. 18] in its entirety. Wilson's motion for summary judgment [Doc. No. 22] is DENIED. Judgment shall enter for Northwestern Mutual.

SO ORDERED.