09-1895-cv
*Wilson v. Northwestern Mutual Insurance Company*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2009

Docket No. 09-1895-cv

Argued: June 10, 2010          Decided: November 4, 2010

_____

MICHELLE WILSON,

*Plaintiff-Appellant*,

- v.-

NORTHWESTERN MUTUAL INSURANCE COMPANY,

*Defendant-Appellee*.

_____

Before:          MINER, SACK, and HALL, <u>Circuit Judges</u>.

Appeal from summary judgment entered in the United States District Court for the Southern District of New York (Young, <u>J.</u>, sitting by designation) in favor of insurer defendant-appellee, in an action brought by plaintiff-appellant claiming she was the beneficiary of two life insurance policies issued by defendant to her late husband, the District Court having found that (1) plaintiff's husband terminated a "Whole Life Policy" in the amount of $150,000 four months prior to his death, and (2) plaintiff's husband retroactively terminated a "Term Life Policy" in the amount of $350,000 when he asked the insurer to "refund his last payment and let the policy lapse."

Affirmed in part, vacated in part, and remanded in part.

DOUGLAS RICHARD DOLLINGER, Goshen, New York, <u>for Plaintiff-Appellant</u>.

CHERYL F. KORMAN, Rivkin Radler LLP (Norman L. Tolle and Merril S. Biscone, <u>of counsel</u>), Uniondale, New York, <u>for Defendant-Appellee</u>.

MINER, Circuit Judge:

Plaintiff-appellant Michelle Wilson ("Wilson") appeals from a summary judgment entered on March 31, 2009, in the United States District Court for the Southern District of New York (Young, J., sitting by designation), in favor of defendant-appellee Northwestern Mutual Life Insurance Company ("Northwestern") on Wilson's claim that she is the beneficiary of two life insurance policies issued to her late husband, Kenneth Wilson ("Kenneth"), by Northwestern. The District Court determined that there were no genuine issues of material fact as to Kenneth's termination of one life insurance policy, the "Whole Life Policy," on February 28, 2005, and failure to pay any premiums after that date. The court further determined that Kenneth also terminated the other life insurance policy, the "Term Life Policy," as of February 28, 2005, when, on May 23, 2005 (several weeks before his death on June 6, 2005), he directed Northwestern to "refund his last payment and let the policy lapse."

I.    Background

    A.    The Insurance Policies: Issuance, Payments and Terminations

On May 29, 2004, Northwestern issued two life insurance policies to Kenneth: a whole life policy ("Whole Life Policy") with a face amount of $150,000 and a term life policy ("Term Life Policy") with a face amount of $350,000. At that time, Kenneth was thirty-five years old, a husband and father of two, and had been a Bank Officer at JP Morgan for the past eleven years.

At Kenneth's request, Northwestern set up an Insurance Service Account ("ISA") whereby the premiums on the two policies would be paid on a monthly basis and funded through electronic fund transfers ("EFT") from Kenneth's bank account. Each of the policies contained the following "Grace Period" provision:

> Grace Period. A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The policy will be in full force during this period. If the insured dies during the grace period, any overdue premium will be paid from the proceeds of the policy.
>
> If the premium is not paid within the grace period, the policy will terminate as of the due date unless it continues as extended term or paid-up

insurance under Sections 7.2 or 7.3.

Each policy further provided for reinstatement more than thirty-one days after the end of the grace period upon submission of evidence of insurability and payment with interest of unpaid premiums. The reinstatement option would be open to the policyholder for five and three years after termination of the Whole Life and Term Life Policies, respectively.

Kenneth did not always pay on time. On three different occasions between August 2004 and early 2005, Kenneth's EFT payments to the ISA were rejected by the bank for insufficient funds, resulting in the closing of the ISA each time. Following each of the first two closings that took place on September 24, 2004, and January 11, 2005, Kenneth made subsequent EFT payments to reopen the ISA and satisfy his premiums. Following the third missed payment and the resulting ISA closing on March 15, 2005, the ISA was reopened once again on April 5, 2005, with an EFT payment of $224.85. Since that amount was insufficient to satisfy Kenneth's premium obligations beyond February 28, 2005, the ISA was "closed yet again" on April 12, 2005.

On April 27, 2005, instead of paying the delinquent payments as he had done in the past, Kenneth called Northwestern and spoke with Melissa Nowak in the Policyowner Services Department. Kenneth asked to have his ISA reopened for the Term Life Policy only and to have the premium for that policy be paid through December 28, 2005. The premium for the Whole Life Policy having been paid through February 28, 2005, and no premium payment having been made within the thirty-one-day grace period, the Whole Life Policy terminated on February 28, 2005. Kenneth provided the necessary banking information so that a one-time draft could be issued to cover the premiums for the Term Life Policy. On April 28, 2005, the ISA was reactivated for the Term Life Policy only, and on April 29, 2005, Kenneth made an EFT payment of $215.60 to his ISA, which satisfied the premiums for March through December. As a result of this transaction, Kenneth's ISA supposedly had a zero balance as of April 29, 2005.

On May 23, 2005, however, Kenneth telephoned Northwestern to inquire about a

3

negative balance reported in his ISA and spoke with Diane Knueppel ("Knueppel"), a Senior Customer Service Representative. From her, he learned that the negative balance resulted from a $35.00 premium adjustment fee. According to Knueppel, the fee could not be waived because Kenneth's Term Life Policy was no longer a companion policy to the terminated Whole Life Policy. Knueppel's notes from her conversation with Kenneth, contemporaneously created that day in Northwestern's Casetracker system, revealed that she "[s]poke with client"; [i]nformed him that the $35 is a policy fee that . . . is no longer waived"; and that "[c]lient is now asking to be refund[ed] his last payment and let the policy lapse." After Knueppel consulted Daniel Stein, Kenneth's Northwestern Field Representative, Knueppel telephoned Kenneth and stated that she was "working on refunding the last draft that was done on the ISA." The record does not reveal any response from Kenneth. In her affidavit in support of Northwestern's motion for summary judgment, Knueppel noted that "[t]he last draft for the term life policy was received on April 29, 2005 and was in the amount of $215.60."

Based on her conversation with Kenneth, Knueppel credited the premium payments for May through December 2005. Knueppel also closed the ISA, effective May 29, 2005. Northwestern then sent Kenneth notice that his Term Policy was paid to May 20, 2005, and that the grace period would expire June 29, 2005. Knueppel claims that, on May 24, 2005, she asked Joyce Barrack, Northwestern's Senior Analyst for authorization to credit the payments made by Kenneth for the months of March, April, and May 2005. Authorization was given, and on May 31, 2005, Northwestern sent two refund checks to Kenneth: (1) $154.07 for the months of June, July, August, September, October, November, and December, and (2) $81.03 for the months of March, April, and May 2005. Although the later-sent refunds purportedly resulted in the Term Life Policy being paid only through February 2005 (with a grace period thirty-one days later), Northwestern never rescinded the letter dated May 23, 2005, which, as noted above, stated that Kenneth's Term Life Policy was paid to May 29, 2005, and that the grace period would expire on June 29, 2005.

4

Kenneth died on June 6, 2005. After Kenneth's death, Wilson, Kenneth's wife, received the first refund check for $154.07, dated May 31, 2005. Wilson never received the second refund check. However, Northwestern's issuance of the second refund check in the amount of $81.03, payable to Kenneth, is recorded in its check registry. Northwestern's records show that the check for $81.03 was never deposited or returned. In June 2005, Wilson submitted a claim for payment on both the Whole Life and Term Life Policies. On July 21, 2006, Northwestern denied Wilson's claims on the ground that both policies were terminated as of February 28, 2005.

B.      Proceedings in the District Court

On March 7, 2007, Wilson commenced an action in the New York State Supreme Court, claiming breach of contract, deceptive and misleading practices, negligence, and violation of N.Y. General Obligation and State Insurance Laws. Wilson v. Nw. Mut. Ins. Co., 603 F. Supp. 2d 705, 706 (S.D.N.Y. 2009). Wilson sought compensatory damages in the amount of $500,000 plus interest, as well as costs and attorneys' fees. Id. On April 6, 2007, Northwestern removed the action to federal court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §1332. Id.

On January 31, 2008, Northwestern moved for summary judgment, and on February 25, 2008, Wilson cross-moved for summary judgment. Id. In a Memorandum and Order dated March 26, 2009, the District Court granted Northwestern's motion for summary judgment, denied Wilson's cross-motion for summary judgment, and dismissed Wilson's complaint. Id. at 715.

The District Court found that Kenneth's Whole Life Policy terminated on February 28, 2005, in that: (1) Kenneth instructed Northwestern not to include the Whole Life Policy when his ISA reopened in April; (2) Kenneth had only paid premiums for the policy through February 28, 2005; (3) Kenneth did not make any payments on the Whole Life Policy after February 28, 2005, or during the thirty-one-day grace period; and (4) Northwestern was not required to notify Kenneth of the cancellation of his Whole Life Policy in writing, pursuant to N.Y. Insurance Law

5

§ 3211. Id. at 710.

The District Court also found that Kenneth's Term Life Policy terminated on February 28, 2005, because (1) the oral agreement between Kenneth and Knueppel, cancelling the Term Life Policy, was not required to be in writing under N.Y. General Obligations Law §§ 5-701, 15-301, and N.Y. Insurance Law § 3204 because it was not a modification of the contract; (2) Kenneth's request for refund of the "last premium payment" could only be interpreted by a reasonable jury as a request for refund of the entire premium payment made on April 29, 2005, which included payments retroactive to February 2005; (3) the New York Dead Man's Statute, N.Y. C.P.L.R. § 4519, did not preclude the testimony of Knueppel; (4) the failure of Kenneth or Wilson to cash the second refund check for $81.03 did not operate as a revocation of Northwestern's offer to terminate the Term Life Policy as of February 2005 instead of May 2005; and (5) Northwestern's notice that Kenneth's grace period for the Term Life Policy would end on June 29, 2005, was an automated response and could not be construed as a new offer given Kenneth's request to refund his premium payments back to February. Id. at 711–714.

The court also found that there was no evidence that Northwestern misled or deceived Kenneth. Id. at 714–15. Accordingly, the District Court granted Northwestern's motion for summary judgment, denied Wilson's cross-motion for summary judgment, and dismissed Wilson's complaint. Id. at 715. Judgment was entered on March 31, 2009, and Wilson timely appealed to this Court.

C.    Arguments on Appeal

On appeal, Wilson argues (1) that Northwestern violated New York law when it failed to provide written notice for the cancellation of the policy and that the cancellation of the Whole Life Policy therefore was not effective; (2) Northwestern's bad faith in cancelling the Term Life Policy retroactively constituted a deceptive business practice under New York law; and (3) that Kenneth's cancellation of the Term Life Policy was not effective because (a) Northwestern's demand for an additional $35.00 constituted a "modification" of the Term Life Policy, and

6

therefore this increase required the retroactive cancellation of the modified policy to be in writing under New York law; (b) any changes in the Term Life Policy, including a cancellation, constitute a "modification" required to be in writing under New York law; (c) there is a question of fact as to whether Kenneth's request for "refund [of] his last payment and [to] let the policy lapse" meant a refund of the payments back to February 2005 or whether Kenneth intended only to cancel the premium payments going forward from May 2005; and (d) Northwestern had a duty to correct the ambiguity caused by service of its May 23, 2005 notice advising Kenneth that his grace period would end on June 29, 2005. Wilson does not challenge the District Court's ruling as to the applicability of the Dead Man's Statute, and we do not consider it here.

**ANALYSIS**

I.    Standard of Review

The District Court's grant of summary judgment is reviewed de novo. Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992). Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582, 305 F.3d 82, 85 (2d Cir. 2002). The role of the court in deciding a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986). Although factual determinations are reviewed in the light most favorable to the non-moving party, the District Court's interpretation of law is reviewed de novo. See Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir. 2008). "Because state law supplies the rules in diversity-of-citizenship cases," New York law applies in this case. See Rosenfeld v. Basquiat, 78 F.3d 84, 88 (2d Cir. 1996).

II.    Applicable Law

7

A.      Termination of Term Life Policy

1.      The Modification Argument

Wilson argues that the reversal of Kenneth's payments and the imposition of an additional $35 fee constituted a prohibited oral change to the express terms of the Term Life Policy that was required to be in writing to be effective. Wilson cites to N.Y. General Obligations Law § 15-301(1) (rule against oral modifications where contract expressly forbids such modifications), N.Y. GEN. OBLIG. LAW § 15-301(1) (McKinney 2010), and N.Y. Insurance Law § 3204(a)(3) ("Such [life] policy or contract cannot be modified, nor can any rights or requirements be waived, except in a writing signed by a person specified by the insurer in such policy or contract."), N.Y. INS. LAW § 3204(a)(3) (McKinney 2006), and to the policy provision that states that "[a] change in the policy is valid only if it is approved in writing by an officer of the Company," to support her claim that notice had to be in writing for any change to the terms of the policy.[1]

Wilson's argument is without merit because there were no modifications, oral or otherwise, of the written terms of the Term Life Policy. Wilson does not refer to anything in Northwestern's handling of Kenneth's cancellation request that violated the express terms of the Term Life Policy. The record in this matter established that Kenneth: (1) telephoned Northwestern Mutual on May 23, 2005, to question why there was a $35 shortage in his ISA, the account through which the Term Life Policy premiums were paid; (2) was informed that he was required to pay the $35 charge because he no longer had multiple Northwestern policies; and (3) requested that the last payment he made for the Term Life Policy be reversed and that he be refunded his last premium payment. Northwestern contends that Kenneth was requesting a

---

[1] Wilson also cites to N.Y. General Obligations Law § 5-701(a)(1), which provides that terms that cannot be performed within one year from making of the agreement must be in writing, to argue that because Kenneth had an obligation to pay premiums for many years, any cancellation of the policy implicated this statute. N.Y. GEN. OBLIG. LAW § 5-701(a)(1) (McKinney 2001). However, the cancellation at issue here could be completed immediately and within one year of the agreement to cancel, and therefore § 5-701(a)(1) is inapplicable here.

refund of the last ten months of payments, which would mean that the policy was only paid up through February 28, 2005. The thirty-one-day grace period therefore would expire on March 31, 2005, and, in accordance with the terms of the policy, the Term Life Policy would have lapsed as of February 28, 2005. Thus, there appears to be no "modifi[cation]" or "change" that would implicate the Term Life Policy under N.Y. Insurance Law § 3204(a)(3). See Loper v. O'Rourke, 382 N.Y.S.2d 663, 665 (N.Y. Dist. Ct. 1976) ("General Obligations Law Section 15-301 . . . , in referring to oral 'changes' in executory contracts, ha[s] been interpreted to relate to actual changes of terms as opposed to waivers of a condition that has the sole effect of keeping the contract viable to the mutual benefit of both parties." (Emphasis added) (citing Jiffy Sew Corp. v. Paar, 286 N.Y.S.2d 865, 866 (App. Div. 1968); Chem. Bank v. Wasserman, 357 N.Y.S.2d 13, 13 (App. Div. 1974); Young v. Bohling, 202 N.Y.S.2d 826, 828 (N.Y. Sup. Ct. 1960))).

Wilson further argues that, because General Obligations Law § 15-301 precluded any modification of the policy, the method of termination was itself invalid. General Obligations Law § 15-301, however, addresses those contracts containing provisions that the contract cannot be changed orally and/or cannot be terminated orally. N.Y. GEN. OBLIG. LAW § 15-301(1) (McKinney 2010). In this regard, Kenneth's Term Life Policy contains only the following provision:

ENTIRE CONTRACT; CHANGES

> This policy with the attached application is the entire contract. Statements in the application are representations and not warranties. A change in the policy is valid only if it is approved by an officer of the Company. The Company may require that the policy be sent to it for endorsement to show a change. No agent has the authority to change the policy or to waive any of its terms.

The Policy does not contain a provision forbidding oral termination by either party, and Wilson fails to identify any action by Northwestern which would constitute a "change" in the Policy. Although Wilson alleges that Northwestern's "act of orally backdating termination-cancellation dates and discontinuing insurance policies" is both against public policy and a violation of the

9

General Obligations Law, Appellant's Br. at 27, there is no legal basis for this claim. She does not cite any public policy that has been violated, and there can be no violation of the General Obligations Law found in Northwestern Mutual's action since the Term Life Policy states that "[i]f the premium is not paid within the grace period, the policy will terminate as of the due date." Since there was no deviation from the written terms of the Term Life Policy, there are no grounds for alleging violation of the General Obligations Law in regard to the method of termination. See Loper, 382 N.Y.S.2d at 665.

The cases cited by Wilson do not support her position. For example, the dispute in Jaffe v. Paramount Communications, Inc., 644 N.Y.S.2d 43 (App. Div. 1996), centered on a termination clause in an employment agreement. This provision expressly required that the employment agreement may only be terminated by written notice. Id. at 45. The employee argued that he could waive that requirement. Id. at 47. The First Department dismissed this argument, relying upon General Obligations Law § 15-301(4), which expressly provides that if a written agreement contains a provision for termination or discharge on written notice, this requirement cannot be waived. Id. In Bank of N.Y. v. Kranis, 592 N.Y.S.2d 67 (App. Div. 1993), the Second Department reaffirmed the well-accepted principle "that a continuing guarantee with a no-oral-modification clause is not amenable to oral termination." Id. at 68. These cases have no bearing on this matter, where there was no change or modification to any provision of the policy.

Also without merit is Wilson's reference to Policy Cancellation Form 18-1680. Although Northwestern uses Form 18-1680 for cancellations of policies, that form is not referred to in the Term Life Policy as a necessary condition to terminate a policy. Although Northwestern's explanation for the form is self-serving,[2] the existence of the form does not bear in any way on

_____

[2] Northwestern explains that Form 18-1680:

> would not have been used with respect to [Kenneth's] request to terminate his term life insurance policy, since he not only requested a cancellation of the policy, but also requested a refund of premiums effective some three

10

the issue of whether the Term Life Policy was modified.

Accordingly, because no modifications to the Term Life Policy were made, the District Court properly concluded that a writing was not required to effect Kenneth's cancellation of the Term Life Policy.

2.     The Argument Against Retroactive Refund

Addressing Wilson's argument that Northwestern's termination of the policy retroactive to February 2005 was not in accordance with Kenneth's instructions or understanding, the District Court concluded that no reasonable jury could find that Kenneth's request in May 2005 that Northwestern refund his last premium payment and let the policy lapse could be construed as terminating the Term Life Policy as of May 2005. See Wilson, 603 F. Supp. 2d at 712. This conclusion is primarily based on the fact that Kenneth made one payment of $215.60 on April 29, 2005, to cover ten months' premiums. Id. at 708. Although the months of February, March, and April had passed at the time of Kenneth's request, the District Court found that a refund of the "last premium payment" was for the entire $215.60, since a payment in that amount was the last transaction in Kenneth's ISA account. See id. at 708, 712.

There is evidence, however, that Kenneth did not intend or expect that the premium refund he requested would include premiums already earned by Northwestern for the coverage provided for February, March, and April. Indeed, it seems unusual that an insurance company would make such a refund. That Kenneth did not contemplate a refund for those months may be derived from the language of his request: to refund premium and "let the policy lapse." See id. at 709. The use of such language would not be entirely logical unless Kenneth meant to cancel his policy as of May 2005, when there was time left for the policy to lapse. Had Kenneth intended

months earlier than the date he requested cancellation. Therefore, the enclosed policy [cancellation] form, which provides that cancellation will be effective at the end of the insurance period for which premiums have been paid, unless an earlier date is requested by contractual terms or state regulation, is not applicable to [Kenneth's] situation. Appellee's Br. at 43 (citations and internal quotation marks omitted).

11

to receive a retroactive refund for his entire payment, there would have been no grace period at all. In other words, if Kenneth requested a retroactive cancellation more than thirty days after the effective termination date, both the policy coverage and the grace period would have been long expired in May, and there would have been nothing that could still have "lapse[d]" as of the date of his phone call. But if Kenneth meant to simply end his policy coverage as of the date of the beginning of the next monthly cycle, the grace period would have remained in effect for thirty days after that date, meaning some time remained before the policy coverage could "lapse." The words "let the policy lapse" would have no meaning if Kenneth intended his refund to be retroactive.

Although the word "lapse"— here referring to the end of a grace period that endures following the cancellation of an insurance policy — may be a term of art in insurance policies, there is no reason to believe that Kenneth was unaware of its meaning when he used the term. His occupation was listed as "Bank Officer" and his employer as "J.P. Morgan Chase" on his life insurance application, and it can be assumed that he was a sophisticated, or at least a well-informed, consumer of life insurance products and well understood what he meant when he directed that the policy "lapse." Kenneth may well have had in mind the option to renew the policy during the grace period before the policy lapsed. In any event, he had the option to do so.

There is also evidence in the record that Northwestern did not regard the cancellation as retroactive so as to oblige it to return premiums already earned. At least initially, Northwestern appeared to agree with the position here taken by Wilson. On May 23, 2005, Kneuppel "reversed" the premiums only for the months of May onward, closed the ISA as of May 29, 2005, and refunded the balance for those months in the amount of $154.07 by check dated May 31, 2005. In a Notice prepared on May 23, 2005 and sent shortly thereafter, Northwestern advised Kenneth that his Term Life Policy was paid to May 29, 2005 and that the grace period would expire on June 29, 2005. It was not until after this never-rescinded notice that Northwestern mailed the never-received check for $81.03 to refund the already-earned premiums

for February, March, and April. Supposedly, Kneuppel required further authorization before she could issue that second check in response to Kenneth's request. It is noteworthy that the retroactive refund was treated as an additional step that was not possible without further authorization, suggesting that the ordinary practice is against retroactive refunds and terminations. Since Wilson never received the second refund check, although she did receive the first after her husband's death, neither she nor her late husband could have been aware that Kenneth's coverage could be shortened by a retroactive refund of premiums. A reasonable jury could find that the retroactive refund was a self-serving afterthought by Northwestern, designed to reduce the length of Kenneth's policy coverage.

B.      Termination of Whole Life Policy

Wilson argues that Northwestern violated Insurance Law § 3211(a)(1) because no statutory written notice of cancellation was sent to Kenneth within six months after termination. As noted by the District Court however, Northwestern was not subject to the notice requirement of Insurance Law §3211(a)(1) because Kenneth had elected to pay the premiums for the Whole Life Policy on a monthly basis. Id. at 710; see also N.Y. INS. LAW § 3211(f)(2) (McKinney 2006). Although Insurance Law § 3211(a)(1) requires an insurer to provide written notice that a policy of life insurance is going to "terminate or lapse by reason of default in payment of any premium," § 3211(f) explicitly exempts from this notice requirement certain categories of policies, including "[a]ny policy of insurance requiring the payment of premiums monthly or at shorter intervals." Id. § 3211(f). See also, e.g., Gerold v. Companion Life Ins. Co., 819 N.Y.S.2d 276, 278 (App. Div. 2006) ("[T]he defendant was not required to notify the plaintiff that the policy lapsed because the insured elected to pay the premiums on a monthly basis."); McGarr v. Guardian Life Ins. Co. of Am., 799 N.Y.S.2d 19, 21 (App. Div. 2005) ("[S]ince premiums were paid on a monthly basis, § 3211(a)(1) does not apply."); Reczek v. Nat'l Benefit Life Ins. Co., 798 N.Y.S.2d 816, 817 (App. Div. 2005) ("It is undisputed that decedent had elected to pay the premiums on a monthly basis. Having made that election, decedent thereafter

13

was required to make monthly payments and the notice requirement of section 3211(a)(1) was rendered inapplicable."); Elston v. Allstate Life Ins. Co. of N.Y., 712 N.Y.S.2d 185, 186 (App. Div. 2000) ("Once the monthly automatic payment option for premiums was chosen the language of Insurance Law § 3211 was triggered, thus obviating the requirement that defendant provide written notification of cancellation prior to its termination of the policy.").

Since Wilson raises no material issue of fact as to Kenneth's election to pay premiums on a monthly basis,[3] it is clear that Northwestern was not required to provide advance written notification of the Whole Life Policy's termination. Because Northwestern was not subject to the notice requirements of § 3211(a)(1), there is no basis for claiming Wilson's entitlement to the proceeds of the Whole Life Policy, and Northwestern's motion with respect to this policy was properly granted.

C.    The Deceptive Practices Argument

Wilson advances a deceptive practices argument in relation to both policies. New York law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. GEN. BUS. LAW § 349(a) (McKinney 1996). To maintain a cause of action under § 349, a plaintiff must show: (1) that the defendant's conduct is "consumer-oriented"; (2) that the defendant is engaged in a "deceptive act or practice"; and (3) that the plaintiff was injured by this practice. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 623 N.Y.S.2d 529, 532–33 (1995); see also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 785 N.Y.S.2d 399, 402 (2004). The "consumer-oriented" requirement may be satisfied by showing that the conduct at issue "potentially affect[s] similarly situated

---

[3] Although Kenneth missed several payments and then paid these amounts at a later time, no reasonable juror could find from these missed payments that Kenneth had modified the contract to set forth a quarterly or longer payments. The contract specifically called for monthly payments, and when Kenneth failed to make these payments his ISA account was closed. Each time his account was reopened, he was required to make delinquent payments for the missed months pursuant to the terms under the reinstatement provision of the respective policies (i.e., pay all missed months and interest on those missed payments).

14

consumers." Oswego Laborers', 623 N.Y.S.2d at 533. Although consumer-oriented conduct does not require a repetition or pattern of deceptive conduct, a plaintiff must "demonstrate that the acts or practices have a broader impact on consumers at large." Id. at 532. Accordingly, New York courts have recongized that "[p]rivate contract disputes" between the parties do not "fall within the ambit of the statute." Id.; see Harary v. Allstate Ins. Co., 983 F. Supp. 95, 98 (E.D.N.Y. 1997) ("Private contractual disputes are usually not within [§ 349] because they are unique to the parties." (internal quotation marks omitted)); MaGee v. Paul Revere Life Ins. Co., 954 F. Supp. 582, 586 (E.D.N.Y. 1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone."); Teller v. Bill Hayes, Ltd., 630 N.Y.S.2d 769, 772 (App. Div. 1995) ("[T]he deceptive act or practice may not be limited to just the parties.").

Further, "[a]n insurance company's actions in settling a claim are not inherently consumer-oriented." Greenspan v. Allstate Ins. Co., 937 F. Supp. 288, 294 (S.D.N.Y. 1996). Therefore, to demonstrate the requisite consumer-oriented conduct in a dispute concerning coverage under an insurance policy, a plaintiff must establish facts showing injury or potential injury to the public, and when such facts are missing, summary judgment in favor of the insurer is warranted.

This action is unique to the parties. Wilson argues that Northwestern's conduct would have a direct effect on consumers at large; however, Wilson makes this argument based on her claim that Northwestern breached, in bad faith, the policies as they were applicable to Kenneth's situation — not that Northwestern has a policy of issuing policies that are deceptive. Moreover, any suggestion that Northwestern has a practice of backdating cancellations is unsupported beyond Kenneth's situation in this case. There is no evidence that Northwestern, in bad faith, systematically backdates all cancellations in order to avoid insurance obligations.

**CONCLUSION**

We affirm so much of the judgment as dismissed Wilson's claim to recover on the Whole Life Policy since, on de novo review, we conclude that there was no issue as to any material fact

15

and that Northwestern was entitled to judgment as a matter of law on that claim.  See Miller v. Wolpoff & Abramson L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).  We vacate and remand for further proceedings consistent with the foregoing so much of the judgment as dismissed Wilson's claim under the Term Life Policy, having found genuine issues of fact in accordance with the requirement that we "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted).